**Irving GORDON, Plaintiff,**

v.

**Robert L. BURR et al., Defendants.**

**No. 71 Civ. 1285.**

United States District Court,
S. D. New York.

Nov. 13, 1973.

Leonard Loewinthan, New York City, for plaintiff.

Rogers & Cooper, New York City (Milton Cooper, New York City, of counsel), for defendant Burr.

Balterman & Geist, New York City (Alan R. Geist, New York City, of counsel), for defendant Elpac, Inc.

Butowsky, Schwenke & Devine, New York City (Michael C. Devine, Alan Steinberg, New York City, of counsel) for defendant Lord.

Bressler, Meislin, Tauber & Lipsitz, New York City (Steven H. Lipsitz, Neil M. Berson, New York City, of counsel), for defendant Phillips, Appel & Walden.

## OPINION

BAUMAN, District Judge.

This is an action brought pursuant to § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5 promulgated thereunder, 17 C.F.

R. § 240.10b–5. The case was tried before this court, sitting without a jury, and what follows constitutes my findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

I.

Irving Gordon, the plaintiff, has been employed as a certified public accountant for over twenty years. He is by his own admission an active investor in the stock market; during 1968, the year of the events in question, for example, he had accounts at two or three brokerage firms and perhaps $100,000 invested in securities. As an accountant he prepared balance sheets and profit and loss statements, conducted audits of corporate clients and prepared tax returns.

In June, 1968, entirely by chance, Gordon met two men in the lobby of the hotel known as Caesar's Palace in Las Vegas. One was Howard Mann, an acquaintance of Gordon's for over twenty years; the other was Arnold Lord, a defendant herein, who was at that time a registered representative associated with Phillips, Appel & Walden (P.A.W.), a New York brokerage firm, also a defendant. Mann explained to Gordon that he and Lord had just returned from a trip to the plant of the defendant Elpac, Inc., a California corporation which manufactured industrial machinery. Earlier in 1968 P.A.W. had managed a private placement of Elpac stock that raised approximately $1,500,000 for the corporation. In that transaction Mann had purchased 5,000 shares of Elpac stock at $10 per share. All this came out in the conversation and Lord went on to describe this to Gordon as an "excellent deal"; he told him that the future of Elpac was promising, and that Elpac stock was currently a "very, very hot thing." Against the backdrop of the whirring wheels of Las Vegas, Gordon, who had done accounting work for Mann and who respected his expertise in the market, found his interest powerfully stimulated. He asked how he might avail himself of this apparently splendid opportunity. Lord, with a master's sure touch, informed him that he would be "putting a package together" in the near future a piece of which he might make available to Gordon. Lord added that he could make no promises because "a lot of people are clamoring for" Elpac stock. With this understanding the men parted.

Within a week of his return to New York City, Gordon was called by Mann, who said that he had asked Lord to include Gordon in the next Elpac offering. Lord himself called a day or two later, acknowledged a conversation with Mann, and told Gordon that there would soon be a meeting of those interested in purchasing Elpac stock. In a second phone call Lord said that the number of shares to become available would be 20,000, of which Gordon could purchase 4,500.

The meeting was held in late June, 1968 at the offices of Steinberg and Pokoik, a real estate concern located at 575 Madison Avenue in New York City. Present at the meeting were Stuart Steinberg, Sr., a member of the firm in whose offices the meeting was held; his son Stuart Steinberg, Jr., a stockbroker at P.A.W.; a Mr. Adlman, another P.A.W. broker; Steven Greenberg, described as a promoter for Elpac; Stanley Jacobson, an attorney representing the Steinbergs, and two gentlemen from Philadelphia whose names are presently beyond the recollection of the participants. Also present were Lord and Robert Burr, then president of Elpac[1] and a defendant in the instant action. With the exception of Lord, Gordon had never met any of these men before, although at the meeting he seemed to become apprised of their respective occupations.

Once assembled the group was informed that Burr wished to sell some of his Elpac stock, that he was desirous of selling 20,000 shares all at once and, consequently, would not sell any fraction

1. Burr was president of Elpac until August 7, 1968, and remained a director through February 1, 1969.

thereof. Burr initially asked a price of $12 per share, but Steinberg, Jr. undertook to negotiate a lower price and appeared to have some success. It was Gordon's understanding that the purchasers were to be himself, Steinberg, Jr., Adlman, and the two men from Philadelphia and that Steinberg, Jr.'s purchase was to be approximately twice his own, in the range of 8 or 9,000 shares.

Jacobson questioned Burr persistently and set various conditions that he insisted be met prior to the consummation of the sale. First, Burr was to obtain the consent of the California Commissioner of Corporations to the sale. Second, he was to obtain a resolution of Elpac's Board of Directors consenting to the registration of Burr's stock. Third, he was to guarantee that the stock would be registered not later than April 30, 1969.

After the meeting broke up several of the participants sought an estimate of Elpac's profits in the near future. Burr stated, in the financial cliche of our times, that the corporation had "turned its corner" and would show a profit for July and for the remainder of 1968. He went on to say that the volume of orders indicated that there would also be a profit in 1969. When these statements were made, Gordon asked to see some financial statements and Burr promised to send him monthly unaudited figures from July onward.

Sometime in July, 1968, within two weeks of this meeting, Lord called Gordon, told him that the necessary documents were coming from California, and asked him to come to Lord's office at P. A.W. The two men met there on July 18, 1968. Also present during all or part of this meeting was George James, an associate of Lord's. At this time Gordon executed two documents, a "Statement of Transferee"[2] which was immediately notarized and a letter to Robert Burr.[3] When Gordon questioned

---

2. The Statement of Transferee (plaintiff's Exhibit 1) reads, in pertinent part, as follows:

"The undersigned intends to purchase 4,500 shares of common stock of ELPAC, Inc., from Robert L. Burr at a price of $12.00 and makes the following statements:

(1) I have received from the issuer and/or the transferor a recent financial statement of the issuer and such additional information with respect to the issuer as I have deemed necessary to make an independent evaluation of the business prospects of the issuer and the fairness of the investment. (x) Yes ( ) No

\*       \*       \*       \*       \*

(5) (a) The names of officers or directors of issuer whom I have known, the length of time I have known them and the nature of my prior business dealings with any of them are set forth below:

None

(b) My recent business experience is summarized briefly below:

Public Accountant

(c) My prior investment experience in business of a similar size and nature of ELPAC, Inc., is summarized below:

Various investments of all kind, at different times over past 10 years.

\*       \*       \*       \*       \*

I understand that I am making these statements for the purposes of evaluation by the Division of Corporations of the State of California and that the Division may rely on these statements in lieu of independent examination in determining whether or not the transfer of the securities of ELPAC, Inc., to me is fair, just and equitable."

3. The letter to Burr (plaintiff's Exhibit 2) reads in full as follows:
"Mr. Robert L. Burr
c/o Elpac, Inc.
18651 Von Karman Avenue
Irvine, California 92664
Dear Sir:

The undersigned hereby agrees to purchase from you 4,500 shares of Common Stock (the 'Shares') of Elpac, Inc. (the 'Company') at $12 per share.

In order to induce the undersigned to purchase the Shares you have made the following representations and warranties to the undersigned:

(a) that the Shares are owned by you, free and clear of all liens, encumbrances, or charges whatsoever;

(b) that the Company is a corporation duly organized, validly existing and in good standing under the laws of the State of California;

(c) that the financial statements of the Company as of Mar. 31, 1968 heretofore de-

the need for these documents, Lord explained that they were required in order to expedite the sale of the shares, that "everybody has already done it" and that Gordon was indeed the last to do so. Although Lord denies having made these statements, I find his denials not worthy of belief. Gordon also asked Lord when the transaction would be approved by the California Division of Corporations and when the corporation would authorize registration. Lord responded that these matters were being "worked on". He also repeated the glowing prognosis of the corporation's future that had been given at the Steinberg and Pokoik meeting. It should also be noted that before signing these documents Gordon consulted neither with Jacobson, who by common consent was to act on behalf of all of the prospective purchasers of Elpac

stock, nor with Stuart Steinberg, Jr., whose office at P.A.W. was but a few feet from Lord's.

Lord called Gordon on at least two occasions in early August, 1968. On each occasion he explained that "red tape" had caused unforeseen delays in processing the various documents necessary for the transaction, but sought to assure him that everything would be resolved shortly. Gordon repeated his request for the corporate financial statements he had been promised and was told that these too would be forthcoming "soon".

On August 20, 1968, plaintiff received a telegram from Burr in California. In it, Burr stated that he agreed to sell Gordon 4,500 shares of Elpac at $10 per share provided that $45,000 was received at Burr's California bank by 1:00

livered to the undersigned are true and correct and properly set forth the financial condition of the Company as of such date;

(d) that there has been no material adverse change in the business operations or financial condition of the Company since the date of the financial statements set forth in the immediately preceding paragraph;

(e) that you do not know of any fact or state of facts which could have a material adverse effect on the Company, its business or operations, and

(f) that no consent of any person or government agency is required as a condition precedent to the sale of the Shares, except the consent of the Commission of Corporations of the State of California.

The undersigned hereby acknowledges and agrees that the Shares are being acquired by the undersigned for his sole account for investment, and not with a view towards the resale or public distribution thereof, and that such Shares will not be sold or transferred except in accordance with the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder; and the undersigned further agrees that a legend to the foregoing effect may be imprinted on any certificate for Shares delivered to him pursuant to this agreement.

The undersigned agrees to execute such documents as may be reasonably required in order to obtain the approval of the Commissioner of Corporations of the State of California to the transactions contemplated hereby; and the consent of such Commissioner is a condition precedent to the obligations of you and the undersigned. In the

event that such consent is not obtained within 21 days from the date hereof, the undersigned shall have the right to terminate this agreement and its obligations hereunder by sending you written notice to the address first above written.

You agree to cause the Company to deliver to the undersigned an agreement or statement in form and substance satisfactory to the undersigned agreeing to include the Shares in the next registration statement filed by the Company with the Securities and Exchange Commission. The receipt by the undersigned of such agreement or statement within 14 days from the date hereof shall be a condition precedent to the obligations of the undersigned hereunder.

The closing of the transactions contemplated hereby shall take place at the offices of Steinberg & Pokoik, 575 Madison Avenue, New York, N.Y. on Aug. 5, 1968. At such time, the undersigned will make payment for the Shares against the delivery thereof.

If the foregoing correctly sets forth your understanding, will you kindly acknowledge agreement to the terms and conditions set forth herein by signing at the place indicated and returning the same to the undersigned.

Very truly yours,
(Signed) Irving Gordon

AGREED AND ACCEPTED:

Robert L. Burr"

It is Gordon's testimony that when he executed the letter, the number of shares was omitted from the first sentence of the letter. He concedes however that it was understood that he would purchase 4,500 shares.

P.M. on the next day. The telegram also recited that the Elpac board had approved the registration of the securities. Gordon immediately called Burr and, finding Lord on another extension in his office, informed both men that he was unable to get the money to California on that day. Burr agreed that receipt of the money on the 22nd would be satisfactory. Gordon then made the necessary arrangements for his bank to wire the funds to California.

On the 22nd Lord and Burr appeared at plaintiff's office, at which time Burr altered the wording of the telegram to reflect the extension of time for payment that he had granted Gordon. Both Burr and Lord then initialed the changes. In the course of their conversation Gordon renewed his already familiar catechism of when the documents approving the sale would be forthcoming, when the monthly financial statements would be furnished, etc. He was told that everything was being taken care of, that the corporation was doing well, and that all of the other members of the group had sent their money as he had.

In the months that followed Gordon was unsuccessful in obtaining not only the documents he had so frequently requested, but also his stock certificates. During September and October he repeatedly spoke to Burr and Lord by phone and was, as usual, assured that all was well. In December, 1968, he was told by Lord that his stock certificates were available at the P.A.W. offices. When Gordon visited these offices in December or January, 1969, no one appeared to have any knowledge of the matter, nor did anyone, including George James, who shared Lord's office, inform him that Lord's employment by P.A.W. had terminated in late 1968.

In the ensuing weeks, Gordon's efforts to contact Lord met with frustration. When he called, Lord would inevitably be out, and when he left messages Lord would fail to return the calls. Gordon finally managed to reach Lord in March, 1969. Lord insisted that the stock was at P.A.W. and told him to pick it up there. On his second trip to P.A.W. he met Steinberg, Jr. and began to discuss the Elpac stock offering. Steinberg told him that he had not purchased Elpac stock, nor, so far as he knew, had anyone else who attended the original meeting.[4] Gordon later placed an indignant phone call to Lord and demanded an explanation. Lord stated that explanations were impossible over the telephone but that he would receive his stock, which finally happened on March 28, 1969. During 1969 Gordon made efforts, through Howard Mann and others, to obtain a refund of his purchase price which, needless to say, were unsuccessful.

## II.

In order to state a claim under § 10(b) and Rule 10b–5, plaintiff must prove the following elements: (1) misrepresentations, omissions, or the employment of some deceptive scheme; (2) materiality; (3) scienter; and (4) reliance. Myzel v. Fields, 386 F.2d 718 (8th Cir. 1967), cert. denied, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968). Plaintiff's burden varies, however, with respect to different defendants. With respect to Burr and Lord, with whom he had face to face dealings, he must establish liability under § 10(b). Elpac and P.A.W., however, can only be found liable as controlling persons under § 20 of the Securities Exchange Act, 15 U.S.C. § 78t[5], as "aiders and abettors", or under the common law

---

4. There is evidence, however, that the Diebold Technology Venture Fund, Inc. purchased 20,000 shares of Burr's stock at $12 per share in the latter part of 1968. (Plaintiff's Exhibit 7). Indeed, the Commissioner of Corporations of the State of California authorized the sales to Diebold and to Gordon simultaneously on October 21, 1968. There is no

evidence, however, that the Diebold transaction was in any way related to the transaction proposed to the group that met at Steinberg and Pokoik in June, 1968.

5. 15 U.S.C. § 78t:

"(a) Every person who, directly or indirectly, controls any person liable under

principle of agency. Thus that aspect of the following discussion that concerns § 10(b) will consider the actions of Burr and Lord. Once their liability under § 10(b) is established, the secondary liability of Elpac and P.A.W. will be considered.

It should be noted at the outset that the discussion of the liability of Lord, Elpac and P.A.W. is rendered wholly academic by plaintiff's choice of the remedy of rescission (see plaintiff's Post Trial Brief, p. 40 and Tr. 261) which is available only against Burr, the seller of the securities. As will appear below, I have concluded that plaintiff is entitled to that remedy. I have nevertheless discussed the liability of the other three defendants because I am mindful of the precedent of Baumel v. Rosen, 412 F.2d 571 (4th Cir. 1969), affirming in part and reversing in part, 283 F.Supp. 128 (D.Md.1968). In *Baumel* the Fourth Circuit affirmed the district court's finding of liability but held rescission an inappropriate remedy and awarded damages instead. Should the Court of Appeals reach a similar conclusion in the instant case, I think it will be useful for them to have the benefit of my views on the liability of the remaining defendants.

■ A. Plaintiff has not succeeded in establishing all of the misrepresentations alleged in his complaint. For example, although I have found that Burr represented to those assembled at the Steinberg and Pokoik meeting that Elpac had "turned its corner" and would show a profit for July and for the following months, plaintiff has failed to es-

tablish that this constituted a misrepresentation. This is so simply because plaintiff offered no evidence of Elpac's financial condition during 1968, 1969, or any other time. Similarly, the failure to furnish monthly financial statements might have constituted a fraudulent course of conduct had *plaintiff* introduced some evidence of what such statements contained.

I am nevertheless satisfied that Lord and Burr did make at least one determinative misstatement regarding the extent of the participation in the Elpac offering.

■ At the meeting at Steinberg and Pokoik, Burr stated that he was only interested in selling his 20,000 shares as a package, and would not sell any lesser amount. At the meeting of July 18, 1968 at P.A.W., Gordon was told by Lord that all of the other members of the group had executed the documents then presented to Gordon, and on August 22 both Burr and Lord assured Gordon that other members of the group had effected payment in the same way that Gordon had. These statements were demonstrably false.

■■ B. The classic formulation of the materiality requirement is found in List v. Fashion Park, 340 F.2d 457 (2nd Cir. 1965), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965). "The basic test of 'materiality' . . . is 'whether a reasonable man would attach importance to the fact misrepresented in determining his choice of action in the transaction in question.' (Citations omitted)." See also Radiation Dynam-

---

any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

(b) It shall be unlawful for any person, directly or indirectly, to do any act or thing which it would be unlawful for such person to do under the provisions of this

chapter or any rule or regulation thereunder through or by means of any other person.

(c) It shall be unlawful for any director or officer of, or any owner of any securities issued by, any issuer required to file any document, report, or information under this chapter or any rule or regulation thereunder without just cause to hinder, delay, or obstruct the making or filing of any such document, report, or information."

ics, Inc. v. Goldmuntz, 464 F.2d 876 (2nd Cir. 1972); Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, 353 F. Supp. 264 (S.D.N.Y.1972). It should further be borne in mind that material information need not be limited to information translatable into earnings. Myzel v. Fields, supra, 386 F.2d at 734, citing SEC v. Texas Gulf Sulphur Co., 258 F.Supp. 262 (S.D.N.Y.1966). The Court of Appeals in *List* pointed out that materiality is, in essence, an objective standard that accompanies the subjective standard of reliance: "[t]hus, to the requirement that the *individual plaintiff* must have acted upon the fact misrepresented, is added the parallel requirement that a *reasonable man* would also have acted upon the fact misrepresented." (Italics in original).

I am convinced that the misstatements regarding the participation of other members of the Steinberg and Pokoik group were material to a determination to purchase Elpac stock. Two recent cases buttress that conclusion. In Myzel v. Fields, supra, a defendant director misrepresented to plaintiff, a shareholder, that another shareholder was "going to get out of the company", i. e. sell his stock. The court held that this representation "could be considered actionable as a misstatement of another's intent or state of mind." 386 F.2d at 734. In Moerman v. Zipco, 302 F.Supp. 439 (E.D.N.Y.1969), aff'd 422 F.2d 871 (2nd Cir.), reh. denied, 430 F.2d 362 (2nd Cir. 1970), plaintiff was induced to subscribe to defendant's stock offering by the representations that the corporation would have only a small group of shareholders. In actuality over 200 people subscribed. Judge Judd found that such a misrepresentation was material in that a reasonable man would accord it importance in determining his course of action. I agree with the conclusions reached in *Myzel* and *Moerman* and conclude that the participation of the other prospective purchasers was material to Gordon's decision. The behavior of the other investors, particularly those offered precisely the same "deal" in terms of price, registration rights, etc. will inevitably influence another investor similarly situated. The knowledge that members of a group, apparently made privy to such a unique opportunity, had all repudiated this opportunity is likely to give any prospective buyer pause.

■ C. The increasingly elusive concept of reliance also finds its classic formulation in List v. Fashion Park, supra, 340 F.2d at 462: "The test of 'reliance' is whether 'the misrepresentation is a substantial factor in determining the course of conduct which results in the recipient's loss' (Citations omitted)." The court went on to note that "[t]he reason for this requirement . . . is to certify that the conduct of the defendant actually caused the plaintiff's injury." See also Colonial Realty Corp. v. Brunswick Corp., 337 F.Supp. 546 (S.D.N.Y.1971). However, in Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), the Supreme Court added the following modification: "[u]nder the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision." 406 U.S. at 153–154, 92 S.Ct. at 1472. See also Chris-Craft Industries, Inc. v. Piper Aircraft Corp., 480 F.2d 341, at 399 (2nd Cir. 1973) (Mansfield, J., concurring and dissenting.)

■ *Affiliated Ute Citizens* thus appears to leave open the question of the existence of a reliance requirement where the gravamen of the offense is misrepresentation rather than nondisclosure. I deem it unnecessary to resolve that difficulty here, for there is ample evidence in the record that Gordon relied on the misrepresentations of Lord and Burr. This is particularly so with regard to the participation of other members of the Steinberg and Pokoik group. As I have already noted, as late as July 18 and August 22 Gordon re-

quired the reassurance that the other members of the group had already acted before committing himself to the transaction. It is clear too that he was impressed by the substantial amount of money (between $80 and $90,000) Steinberg, Jr. was willing to commit in the offering.

The defendants vigorously dispute plaintiff's claim of reliance. They contend, first of all, that some allowance should be made for plaintiff's sophistication as an investor, which should at the very least increase his burden of proving that he relied on others no more, and perhaps less expert than he. See Kohler v. Kohler, 208 F.Supp. 808 (E.D. Wis.1962), aff'd 319 F.2d 634 (7th Cir. 1963).

This contention ignores both the law of this circuit and the facts of this case. A recent study[6] strongly suggests that our Court of Appeals has been loath to modify the reliance requirement to account for characteristics peculiar to the individual plaintiff.[7] See List v. Fashion Park, supra; Heit v. Weitzen, 402 F.2d 909 (2nd Cir. 1968), cert. denied, 395 U.S. 903, 89 S.Ct. 1740, 23 L.Ed.2d 217 (1969); SEC v. Texas Gulf Sulphur, 401 F.2d 833 (2nd Cir. 1968), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). Other circuits have apparently accorded greater weight to the plaintiff's background and expertise in determining reliance. See Kohler v. Kohler, supra; City National Bank v. Vanderboom, 422 F.2d 221 (8th Cir.), cert. denied, 399 U.S. 905, 90 S.Ct. 2196, 26 L.Ed.2d 560 (1970); Clement A. Evans & Co. v. McAlpine, 434 F.2d 100 (5th Cir. 1970), cert. denied, 402 U.S. 988, 91 S.Ct. 1660, 29 L.Ed.2d 153 (1971).

Even if one is, as defendants urge, to probe more deeply into the peculiar characteristics of the plaintiff, the following observations are perhaps also in order. Experience does not equal expertise, and there is nothing in plaintiff's behavior here to suggest that he possessed any particular investment acumen. He emerges, on the contrary, as a not particularly unique "greedy kind of guy",[8] eager to make quick profits and thus rather vulnerable to the blandishments of those capable of concocting an appealing scheme. I suggest that despite his accounting background and the extent of his investments, plaintiff's expertise appears scarcely, if at all, better than average.

The second point that defendants raise in an effort to rebut plaintiff's allegations of reliance is that "there should be no doubt that he relied not upon any of the defendants but rather upon the fact that his lifelong friend, one Howard Mann, had made a similar purchase in Elpac shortly before." (Defendants' Post Trial Memorandum of Law, p. 18). It cannot be questioned that one of the factors that motivated Gordon here was Mann's participation in a previous Elpac offering and his evident satisfaction with the transaction. It was undoubtedly Mann who first whetted Gordon's interest. Nevertheless once this interest was aroused, Gordon placed himself in the hands of Lord and Burr: he sought their advice, not Mann's, in July and August, 1968, and it was at their urging that he signed the documents and made payment for the stock. The record reveals further that he did not consult Mann again until Steinberg, Jr.'s revelations of March, 1969, at which point Lord and Burr's deception become clear. Thus I find that

6. Note, "Reliance under Rule 10b–5: Is the 'Reasonable Investor' Reasonable?" 72 Columbia L.Rev. 562 (1972).

7. The Second Circuit's test, it is argued, "does not examine those matters unique to the specific case that may have rendered the plaintiff-investor's reliance in the given factual situation any more or less reasonable than that of the 'reasonable investor.'" 72 Columbia L.Rev. at 567.

8. The characterization is Lord's (Tr. 204), and nothing in the record contradicts it.

Mann's purchase was but one factor influencing Gordon, and it was easily superseded in importance by the statements and actions of Lord and Burr.[9]

■ D. Plaintiff erroneously argues that proof of *scienter* is no longer required in actions under § 10(b). Our Court of Appeals has recently stated that there can be no violation of that section "in the absence of allegation of facts amounting to *scienter*, intent to defraud, reckless disregard for the truth, or knowing use of a device, scheme or artifice to defraud. It is insufficient to allege mere negligence." Shemtob v. Shearson, Hammill & Co., 448 F.2d 442 (2nd Cir. 1971). See also Lanza v. Drexel & Co., 479 F.2d 1277 (2nd Cir. 1973); Globus v. Law Research Service, Inc., 418 F.2d 1276 (2nd Cir. 1969), cert. denied, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970). The standard was further analyzed in Cohen v. Franchard Corp., 478 F.2d 115 (2nd Cir. 1973): "[a]lthough it is unnecessary to prove the specific fraudulent intent essential to a claim of common law fraud, it must be established that the defendant was to some extent cognizant of the misstatement or omission." Other circuits have, admittedly, abolished the *scienter* requirement. See Ellis v. Carter, 291 F.2d 270 (9th Cir. 1961); Stevens v. Vowell, 343 F.2d 374 (10th Cir. 1965); Myzel v. Fields, *supra*; Batchelor v. Legg & Co., 52 F.R.D. 545 (D.Md.1971).

■ Given such a standard, I find that Lord and Burr possessed the requisite knowledge of the falsity of their representations to Gordon. In the meetings of July 18 and August 22, when they told Gordon that others had already subscribed to the Elpac offering, they could not help but realize the falsity of these statements. It is admitted that the additional copies of the documents which Gordon signed on July 18 were kept at P. A. W., and thus Lord must have known whether or not others had executed them. In addition, I find that the repeated failure to produce the Elpac financial statements in the face, of Gordon's persistent requests is other and additional evidence of their intent to hide from him the realities of Elpac's financial condition. Any suggestion that this failure was purely inadvertent staggers the imagination in its audacity.

In conclusion, I am satisfied that plaintiff has proven the liability of Burr and Lord under § 10(b) and Rule 10b–5. I now turn to the secondary liability of Elpac and P.A.W.

### III.

Before considering the liability of Elpac and P.A.W., a brief prefatory note regarding competing theories of liability is in order. Plaintiff alleged in his complaint that the defendants were liable under theories of agency, and aiding and abetting. At the trial and in his post trial brief he in effect amended his complaint by alleging that these defendants were "controlling persons" under § 20(a) of the Securities Exchange Act, set out at footnote 5, supra. The relationship between § 20(a) and other available theories of secondary liability remains unclarified, although it has recently been the subject of a thorough analysis in Ruder, "Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, In Pari Delicto, Indemnification and Contribution", 120 U.Pa.L.Rev. 597 (1972). It has

9. A similar argument seems to have been advanced in Moerman v. Zipco, Inc., supra, where a defendant (Nasser) contended that Moerman, the plaintiff, had relied not on his statements but rather those of a third party, Blum. The court recognized that plaintiff may indeed have relied on Blum "to some degree", but also observed that "[n]evertheless, Moerman insisted on talking with Nasser before acting." 302 F.Supp. at 446.

The court then found Nasser liable under § 10(b) because he either confirmed Blum's misstatements or made no effort to correct the erroneous impression he knew Moerman had received. The same reasoning applies here *a fortiori*: Gordon consulted Lord and Burr at every juncture where action was required, and it was clearly their statements, not Mann's, that prompted those actions most directly.

been contended by some, most notably the SEC, that § 20 was not designed to cover the traditional employer-employee relationship; in such situation, traditional agency law would be a sufficient premise for liability. Instead, it is argued that § 20 was intended to reach situations in which there are "technical legal barriers" between those responsible for the fraudulent acts and those injured by them. See Ruder, supra, at pp. 607–609. This view has found support in Johns Hopkins University v. Hutton, 297 F.Supp. 1165 (D.Md.1968), aff'd in part and rev'd in part, 422 F.2d 1124 (4th Cir. 1970). See also Kamen & Co. v. Paul H. Aschkar & Co., 382 F.2d 689 (9th Cir. 1967), cert. dismissed, 393 U.S. 801, 89 S.Ct. 40, 21 L.Ed.2d 85 (1968). The principal virtue of this thesis, for a plaintiff, is that the defense of good faith, available under § 20, is unavailable under the theory of *respondeat superior*.

This is not, however, the view of the majority of circuits, as Judge Tyler has recently pointed out in S.E.C. v. Lum's, Inc., 365 F.Supp. 1046, CCH Fed. Sec. Law Rep. ¶ 94,134 (S.D.N.Y. 1973).[10] He reads both the majority and the dissenting opinions in Lanza v. Drexel & Co., supra, to suggest that § 20(a), and not *respondeat superior* is the appropriate standard for determining secondary liability under the Securities Exchange Act. Judge Judd's opinion in Moerman v. Zipco, Inc., supra, which was affirmed by the Court of Appeals, also supports the exclusivity of § 20(a). See also, Moscarelli v. Stamm, 288 F.Supp. 453 (E.D.N.Y.1968). I agree with this construction and shall follow it in the analysis which ensues.

A. In considering P.A.W.'s liability, one must begin with the proposition that brokerage firms are obliged to exercise stringent supervision over their salesmen. Moerman v. Zipco, Inc., supra, 302 F.Supp. at 447; Lanza v. Drexel & Co., supra, 479 F.2d at 1301. See also S.E.C. v. Lum's, Inc., supra; Moscarelli v. Stamm, supra; Hecht v. Harris, Upham & Co., 283 F.Supp. 417 (N.D.Cal.1968). Only by demonstrating that it has maintained a high degree of supervision can a brokerage firm meet the burden of good faith required to escape liability under § 20(a).[11] In one leading case the defendant's burden has been characterized thus: "[t]o satisfy the requirement of good faith it is necessary for the defendants to show that some precautionary measures were taken to prevent the injury suffered." Lorenz v. Watson, 258 F.Supp. 724, at 732 (E.D.Pa.1966).

The record before me discloses that Gordon was not a regular customer of P.A.W., nor did P.A.W. have any formal role in managing the Burr offering, as it did with the May, 1968 private placement of 150,000 Elpac shares. These facts, however, only tend to establish that P.A.W. could not be held primarily liable under § 10(b); the standard under § 20(a) is a far lower one. The record does reveal that Lord was an employee of P.A.W. through November, 1968, and that the July 16 meeting at which Gordon executed the "Statement of Transferee" and the investment letter took place at P.A.W.'s offices. Paragraph 5(e) of the Statement of Transferee, filled out in advance by Lord and executed by Gordon, read as follows:

"I have received advice from the following professional adviser or ad-

10. See, e. g., Myzel v. Fields, supra; Richardson v. MacArthur, 451 F.2d 35 (10th Cir. 1971); Hecht v. Harris, Upham & Co., 430 F.2d 1202 (9th Cir. 1970).

11. The burden of proving good faith rests on the defendant. See Ruder, supra, at p. 602. See also, S.E.C. v. First Securities Co. of Chicago, 463 F.2d 981 (7th Cir. 1972), cert. denied sub nom. McKy v. Hochfelder, 409 U.S. 880, 93 S.Ct. 85, 34 L.Ed.2d 134 (1972). In that case the Seventh Circuit reversed a trial court's approval of a special master's report which concluded that the S.E.C. had failed to demonstrate the brokerage firm's bad faith. The court noted that "the district judge gravely misapprehended the operation of § 20(a)." 463 F.2d at 987.

visers in connection with my proposed investment in ELPAC, Inc.: (State 'none' if none.)

> Arnold Lord
> P A & W, 469 7 Ave. NYC 10018"

Although the defendant contends that Lord did no more here than set forth his business address, it should be noted that the question posed in 5(e) does not require such an address. One must infer, at the very least, that Lord intended to insure that his institutional affiliation was known both to Gordon and to Elpac.

There is further evidence of P.A.W.'s involvement. No fewer than three of its registered representatives (Adlman, Steinberg, and Lord) attended the June meeting at Steinberg and Pokoik. Furthermore, the circumstances of Lord's departure from P.A.W. and the nature of his subsequent relationship with the firm continue to be puzzling. Gordon attempted to call Lord on numerous occasions at P.A.W. but was never told that he no longer worked there. When he visited the P.A.W. offices in December, 1968 or January, 1969, no one, including Lord's office mate, saw fit to tell him that.

The foregoing strongly tends to suggest that P.A.W. failed to supervise its salesmen adequately. Furthermore, as I have already noted, P.A.W. had the burden of proving its good faith by demonstrating an adequate system of supervision. Yet P.A.W. called no witnesses at the trial. A demonstration of the kind of showing necessary to meet the good faith burden can be found in S.E.C. v. Lum's Inc., supra. There Lehman Brothers, the defendant broker-dealer, introduced several witnesses who testified to its supervisory system, which consisted of a compliance department staffed by several attorneys who would periodically meet with the firm's salesmen to discuss, inter alia, problems of inside information. Even with such a showing the trial court found the issue of the firm's liability a "close" one, although it ultimately held for the defendant. No demonstration of good faith has been made here, and I am satisfied that P.A.W.'s involvement in these transactions is sufficient to hold it liable under § 20(a).

B. The problem of Elpac's liability is far more difficult, and the guidelines for corporate liability for the acts of its officers under § 20(a) are less defined than for that of brokerage firms. In Myzel v. Fields, supra, we are told that § 20(a) "has been interpreted as requiring only some indirect means of discipline or influence short of actual direction to hold a "controlling person liable". 386 F.2d at 738. On the other hand, our Court of Appeals, in speaking of the liability of directors under this section, has stated that "[t]he intent of Congress in adding this section . . . was obviously to impose liability only on those directors who fall within its definition of control and who are *in some meaningful sense culpable participants* in the fraud perpetrated by controlled persons." (Emphasis supplied). Lanza v. Drexel & Co., supra, 479 F.2d at 1299. The paucity of guidance in this area has been noted by Judge Tyler in S.E.C. v. Lum's, Inc., supra: "[i]n general, courts have held a corporation-issuer liable on agency principles for what can be deemed the corporate acts of its principal agents without much discussion . . . ." He went on, however, to find this "an appropriate analysis . . . because it is difficult to conceive of a corporation acting in any other way than by its managing officers and directors."

Without quarrelling with the foregoing observation, I wish to note two facts at the outset. First, Burr ceased being Elpac's president on August 7, 1968, although he continued to be a director. Although some of his misrepresentations were made before this date, still others were made later. In particular, his telegram to Gordon of August 20, signed "Robert L. Burr Elpac Inc." could not have been a statement by Elpac. Much more importantly, I do not consider any of Burr's activities to be *corporate* acts. He was selling his own stock, not El-

pac's. There was some testimony[12] at the trial that Burr had stated at the June meeting that the proceeds of the sale of the shares would be used to pay off an Elpac bank loan that Burr had cosigned. But the record contains not the remotest indication of the use to which the money was ultimately to be put.

Nor does the record contain any evidence that Elpac participated in or indeed knew anything of Burr's fraudulent acts. It is not even entirely clear whether or not the Elpac board ever authorized registration rights for the stock Burr sold. Despite the representation in Burr's telegram, no corporate minutes were introduced in evidence to substantiate this claim. The extent of Elpac's involvement in this transaction appears to have been the purely ministerial act of transferring some of Burr's shares on the books of its transfer agent.

The question of Elpac's liability is a difficult one largely because plaintiff has failed to introduce any greater evidence of Elpac's involvement than the fact that Burr was for a time Elpac's president. If I were to find Elpac liable, it would be on this fact alone, and I am unwilling to reach such a conclusion. My refusal to hold Elpac liable here is less a reflection on Elpac's role than a comment on the exceedingly meagre state of the record. Before a defendant is required to meet its burden of good faith under § 20(a), plaintiff must make a *prima facie* showing that the defendant in some meaningful sense "controlled" the actions of one liable under § 10(b). I find no evidence in this record of control, direct or indirect of Burr by Elpac in what were clearly not corporate acts. I therefore hold that Elpac is not liable under § 20(a).

### IV.

§ 29(b) of the Securities Exchange Act, 15 U.S.C. § 78cc(b), provides, in pertinent part, that "[e]very contract made in violation of any provision of this chapter or of any rule or regulation thereunder . . . shall be void." Rescission is therefore available as a remedy for those defrauded under any of the provisions of the 1934 Act. Myzel v. Fields, supra; Estate Counselling Service v. Merrill Lynch, Pierce, Fenner & Smith, 303 F.2d 527 (10th Cir. 1962); Adelman v. CGS Scientific Corp., 332 F.Supp. 137 (E.D.Pa. 1971); John R. Lewis, Inc. v. Newman, 446 F.2d 800 (5th Cir. 1971). As I have already noted, plaintiff at the close of the trial elected rescission, although his complaint requested both rescission and damages in the alternative. This election was, furthermore, implicit in his conduct of the trial, for no evidence was submitted on the question of damages under any standard by which they might be computed.[13]

The only obstacle to plaintiff's invocation of rescission is the defense of laches which the defendants assert.[14] Although at least one court appears to have held the defense unavailable in actions under the 1934 Act, see Myzel v. Fields, supra, 386 F.2d at 742, the majority of courts have permitted it. Royal Air Properties v. Smith, 312 F.2d 210 (9th Cir. 1962); Guarantee Insurance

12. Testimony of Stuart Steinberg, Jr. (Tr. 167–168).

13. For an illustration of the differing theories under which damages have been awarded a defrauded buyer in this circuit and elsewhere, compare Levine v. Seilon, Inc., 439 F.2d 328 (2nd Cir. 1971) and Janigan v. Taylor, 344 F.2d 781 (1st Cir. 1965) (out of pocket rule) with Chasins v. Smith, Barney & Co., 438 F.2d 1167 (2nd Cir. 1970) and Ross v. Licht, 263 F.Supp. 395 (S.D.N.Y. 1967) (difference between purchase price and subsequent resale price).

14. At the close of the plaintiff's case, defendants Lord, P.A.W. and Elpac moved to amend their answers to include the defenses of laches and absence of real party in interest. (Burr had previously interposed these defenses in his answer.) Because the equitable relief does not run against any defendant but Burr, the others have no standing to raise the equitable defense of laches. The motion is in other respects deemed granted. See F.R.Civ.P. 15(b).

Agency v. Mid Continental Realty Corp., 57 F.R.D. 555 (N.D.Ill.1972); Shapiro v. Schwamm, 279 F.Supp. 798 (S.D.N.Y. 1968). To invoke the defense, the defendant must demonstrate: (a) a lack of diligence on the part of the plaintiff and (b) prejudice to the defendant resulting from the delay. Hecht v. Harris, Upham & Co., 430 F.2d 1202 (9th Cir. 1970). In cases such as this the two criteria have been inseparable. That is, the prejudice flows from the delay by the usually precipitous decline in the value of the stock which the defrauded buyer now seeks to return. Hence the policy behind the defense of laches was well stated in Royal Air Properties v. Smith, supra: "[t]he purpose of the Securities Exchange Act is to protect the innocent investor, not one who loses his innocence and then waits to see how his investment turns out before he decides to invoke the provisions of the Act." By way of illustration, in Baumel v. Rosen, 412 F.2d 571 (4th Cir. 1969), cert. denied, 396 U.S. 1037, 90 S.Ct. 681, 688, 24 L.Ed.2d 681 (1970), rescission was refused a plaintiff who waited 18 months between the discovery of the fraud and the renunciation of the sale.

▇▇▇▇ Defendants premise their defense of laches on the interval between March, 1969, plaintiff's discovery of the fraud, and April, 1971, the time when the instant suit was initiated. That is not, however, the relevant interval for purposes of determining plaintiff's entitlement to rescission. Rather, the court in assessing the diligence with which .this matter has been pursued must look to the lapse of time between the discovery of the fraud and plaintiff's initial efforts to tender his shares or disclaim the sale. In the instant case very little time elapsed between these two occurrences. As soon as Gordon discovered that of the original group only he had purchased Elpac, he contacted Mann, who was his link with Lord. He asked Mann's help in getting in touch with Lord and in getting his money back. He finally succeeded in con-

tacting Lord in June or July, 1969 and demanded that Lord help return his money. Lord proffered a few vague assurances and said that he would do everything he could. The plaintiff evidently never heard from Lord again and was unable to reach Burr, who was by that time neither a director or an officer of Elpac. He was in continuous contact with Mann, however, who told him that Lord was making some efforts to regain Gordon's investment. Gordon first sought the advice of counsel in late 1969, but the attorney whom he consulted, Stanley Jacobson, was unwilling to represent him in a lawsuit against a brokerage firm. During 1970 Gordon continued to invoke Mann's assistance in an effort to rescind the sale without bringing suit. The instant action was, as has been noted, commenced in April, 1971.

The foregoing establishes to my satisfaction that the defense of laches is inapplicable. Plaintiff acted immediately to undo the transaction; nothing in the record suggests that he sat back to observe the fortunes of Elpac before seeking rescission. Any delay in the commencement of litigation appears to have been occasioned by plaintiff's efforts to resolve the controversy informally. Such a delay will not negate plaintiff's right to seek rescission. See In re Cohen's Will, 51 F.R.D. 167 (S.D.N.Y. 1970).

V.

▇▇▇ The defendants have raised one other defense which merits brief consideration. Upon cross-examination Gordon admitted that he had contributed only $30,000 toward the purchase of the stock, and that the remaining $15,000 had been contributed by four other individuals. Lord was aware of this arrangement, and the four purchasers agreed that all the shares be received in Gordon's name. Gordon thus still possesses a certificate for 4,500 shares of Elpac stock in which the other purchas-

ers have a one-third interest. Defendants therefore contend that plaintiff is not the "real party in interest" with respect to this portion of the stock and that Gordon can only maintain an action based on the 3,000 shares he owns. This contention is refuted by the plain language of Rule 17(a) of the Federal Rules,[15] which provides that "a party with whom or in whose name a contract has been made for the benefit of another . . . may sue in his own name without joining with him the party for whose benefit the action is brought." In Bache & Co. v. International Controls Corp., 324 F.Supp. 998 (S.D.N.Y.1971), a brokerage firm brought suit against a tender offeror for failure to accept plaintiff's tender of securities. Of the shares tendered, approximately 9,000 belonged to the firm and approximately 21,000 to its customers, and the defendants argued that plaintiff could not obtain a recovery for its customers' shares. The court rejected this contention, citing Rule 17(a) and holding, *inter alia*, that as the party in whose name the contract was made, the firm could properly bring the action on its customers' behalf. See Edward B. Marks Music Corp. v. Jerry Vogel Music Co., 140 F.2d 268 (2nd Cir. 1944). Accordingly, I find defendants' contention to be meritless.

### Conclusion

To summarize, plaintiff is entitled to rescission of his purchase of 4,500 shares against Burr, the seller. The action is dismissed as to Lord and P.A.W. because plaintiff, having chosen rescission, states no claim against either of these defendants. The action against Elpac is dismissed on the merits.

The parties are directed to settle a judgment on notice.

15. F.R.Civ.P. 17(a):
"Real Party in Interest. Every action shall be prosecuted in the name of the real party in interest; [but] an executor, administrator, guardian, trustee of an express trust, a party with whom or in whose name a contract has been made for the benefit of another, or a party autho-

rized by statute may sue in his own name without joining with him the party for whose benefit the action is brought; and when a statute of the United States so provides, an action for the use or benefit of another shall be brought in the name of the United States."