**Ray BARTHE, Plaintiff,**

v.

**Alfred C. RIZZO et al., Defendants.**

**No. 73 Civ. 1014. (WCC)**

United States District Court,
S. D. New York.

July 26, 1974.

Julien & Schlesinger, P. C., New York City, for plaintiff; Jesse Alan Epstein, New York City, of counsel.

H. Elliot Wales, New York City, for defendant Rizzo.

Wohl, Lipton, Loewe, Stettner, Becker & Krim, New York City, for defendant Kern Securities Corporation; Leonard H. Krim, New York City, of counsel.

## OPINION
## AND ORDER

CONNER, District Judge:

Plaintiff commenced this action pursuant to Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, to recover a $100,000 investment. This action was tried without a jury and accordingly this opinion constitutes findings of facts and conclusions of law pursuant to Rule 52, F.R.Civ.P.

### I.

The testimony adduced at trial established that plaintiff, a man of modest means, first became seriously involved in the stock market in the late 1950's or early 1960's when he invested about $20,000 in an account at the brokerage firm of Spencer, Trask, & Co. This account was maintained until 1967 when it was transferred to the firm of Tessel, Paturick & Ostrau, Inc. ("TPO"). The change was occasioned by the meeting of plaintiff and defendant Alfred C. Rizzo ("Rizzo"), in the latter part of 1966 at the local Y.M.C.A. Rizzo was at that time a registered representative for TPO, and was interested in taking over Barthe's account which was then valued at about $150,000. When Rizzo finally did take over the account he was given full discretion in its management. During the latter part of 1967 Rizzo left TPO to join Scheinman, Hochstin & Trotta, Inc., and transferred plaintiff's account to that firm. In August 1968, Rizzo again changed employment, taking plaintiff's account, this time to defendant Kern Securities Corporation ("Kern"). Rizzo successfully managed plaintiff's account and within a short time it was valued at approximately $900,000.

The proof at trial disclosed that Barthe's overriding interest was in capital appreciation, and that he was not especially concerned with how it should be achieved, although he actively monitored the status of the account. Barthe and Rizzo met frequently and often discussed the fortunes which had been made by investing in companies prior to their "going public." Barthe was advised that such a "venture capital" deal afforded an opportunity to get rich quickly. Barthe became interested and, sometime before the events in issue, invested, at Rizzo's suggestion, in a venture capital deal which aborted, with Barthe's money eventually being returned to him.

In June, 1968 Barthe moved to Florida, but remained in close contact with Rizzo. At about this time, Rizzo first mentioned a venture capital deal involving a Chicago company named Institute of Management Training ("IMT"). Early in 1969 Rizzo went to see Barthe in Florida to discuss the IMT deal. Although Rizzo denied having told Barthe

that he would have any influence on the company's eventual success, it is clear that Rizzo was very enthusiastic about the company's possibilities. He felt that his contacts and friends "on the street" were good assurance that the company would succeed in the contemplated public offering. Rizzo asked Barthe to invest $100,000 in return for a note for $93,000 (which would probably be paid within 6 months) bearing 7% interest, plus 10,000 shares in IMT which he expected would open at $5.00 per share.

Rizzo had brought two documents with him which he showed to Barthe: an agreement to assign to Barthe a note given by IMT to Rizzo for $93,000, and an agreement to transfer 10,000 shares of stock in IMT to Barthe in consideration of $7,000. Barthe testified that he really didn't understand the documents but gave his consent, and when he received his monthly statement from Kern, it reflected a $100,000 withdrawal. Near the end of March, 1969, the docuents were sent back to Barthe with the cancelled check to IMT for $100,000 attached. Rizzo also sent him the cover page of IMT's offering circular, but no further financial information.

In May 1969 Barthe was in New York and met with Rizzo who told him that things were going smoothly with IMT. However, by September, Barthe's inquiries were rebuffed by Rizzo.

Barthe then decided to write to IMT. He eventually learned, through communicating with Melvin Newman, the attorney for IMT, that Rizzo held almost half of the total shares of IMT, because Rizzo had invested $100,000 which constituted virtually the entire current assets of the company.

## II.

The gravamen of plaintiff's original complaint was that Rizzo induced him to lend $93,000 to IMT and to purchase 10,000 shares in IMT for $7,000 by means of false and fraudulent representations and omissions of material fact. He alleged that Rizzo assured him that the investment was "riskless" when in fact it was highly speculative; and that Rizzo proferred Barthe's money as his own.

But in his testimony plaintiff admitted that he was aware that no investment is riskless and, both at the trial and in his post-trial memoranda, he has taken the new line that: 1) Barthe believed Rizzo was acting as his broker and not as one who stood to gain enormously from the financing of IMT; 2) Barthe was virtually the sole source of IMT's cash funds; 3) despite the fact that Barthe stood to lose $100,000, he was getting only 7,000 shares and a note for $93,000, while Rizzo was getting 110,000 shares or 47% of the total stock, for the principal reason that he had persuaded Barthe to put up $100,000, which Rizzo proferred to IMT as his own money; and 4) Barthe was furnished no financial data about the company.

Accordingly, the proof at trial and the post-trial memoranda will be treated as an amendment of the Complaint.

While Rizzo claims that he was made a director of IMT and given 47% of its stock at least in part because of his anticipated assistance in securing an underwriter for the stock issue, he does not deny that a substantial factor in his receipt of these benefits was the fact that he brought in Barthe's $100,000 or that this was the only cash put up by anyone. Rizzo also admits that he did not inform Barthe of these facts or of any other details of IMT's financing, but merely sent him the cover page of the offering circular. However, Rizzo defends these actions by proclaiming that "Barthe was not interested in full disclosure—he was not even interested in minimum disclosure." Brief for Rizzo at 18. That argument ignores the purpose of the securities laws. In Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972), the Supreme Court, citing Securities and Exchange Commission v. Capital Gains Research Bureau, 375 U.S. 180, 186, 84 S. Ct. 275, 11 L.Ed.2d 237 (1963), ruled that the 1934 Securities Act and its

companion legislative enactments embrace a "fundamental purpose . . . to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry."

Rizzo's contention that the IMT deal was a purely private deal, and therefore not one within the contemplation of the securities laws is also unfounded. In Superintendent of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971), the Supreme Court held that the Congressional purpose behind § 10(b) was to "bar deceptive devices and contrivances in the purchase or sale of securities whether conducted in the organized market or face to face." This basic purpose is no less pertinent in purely private transactions. Reube v. Pharmacodynamics, Inc., 348 F.Supp. 900, 915 (E.D.Pa.1972).

Rizzo further contends that IMT had eminently qualified principals and that there was a bona fide attempt to complete a successful financing. In this regard, he emphasizes the part he played in attempting to launch the enterprise.

In the first instance, there is no claim by Barthe that Rizzo did not use his best efforts to obtain a public offering. Moreover, the question is not whether the deal was potentially a good one, but whether disclosure of Rizzo's interest might have influenced Barthe's decison to buy the stock and make the loan. See Affiliated Ute Citizens of Utah v. United States, *supra,* 406 U.S., at 153–154, 92 S.Ct. 1456, at 1472; Chasins v. Smith, Barney & Co., 438 F.2d 1167, 1171 (2d Cir. 1970). It is clear that Barthe was entitled to know that Rizzo was in a position to gain financially from the deal. See Affiliated Ute Citizens of Utah v. United States, *supra,* 406 U.S., at 153, 92 S.Ct. 1456, at 1472.

Rizzo presses the theory that Barthe is not as naive and uninformed in the ways of finance as he pretends. In support of his theory, Rizzo recounted instances when he went to the library with Barthe and Barthe read financial journals. He further claims that Barthe inquired daily as to the progress of his investments, and that therefore he did not rely to any great extent on Rizzo's judgment. Rizzo apparently contradicts himself by also insisting that he had full discretion with Barthe's account and that "Barthe accepted Rizzo's investment decisions without question." Brief for Defendant Rizzo at 18.

Rizzo's attempt thus to straddle the pit of liability is unavailing, since neither side affords him firm footing. The fact that the client is sophisticated should not excuse the failure to provide full and accurate disclosure because "sophisticated investors, like all others, are entitled to the truth." Stier v. Smith, 473 F.2d 1205, 1207 (5th Cir. 1973). On the other hand, the fact that the client gave the broker full discretion and "did not ask any questions" (Brief for Defendant Rizzo at 18), would not relieve the broker from his obligation to disclose the facts relevant to any possible conflict of interest. One in a fiduciary relationship, as is a securities broker, and who sells to a client securities in which he has an interest, is not excused from his duty to disclose that interest merely because the client was not sufficiently suspicious to think of asking. See Hughes v. Securities and Exchange Commission, 85 U.S.App.D.C. 56, 174 F.2d 969, 976 (1949). *Cf.* Stier v. Smith, *supra,* 473 F.2d at 1208; Dale v. Rosenfeld, 229 F.2d 855, 858 (2d Cir. 1956).

Furthermore, Rizzo's contention that he did not act as a broker in the IMT deal, but that he and Barthe were in effect partners, would not obviate his obligation to Barthe. Rizzo was admittedly an insider in possession of information about IMT which was not generally available, and therefore was similarly under a duty to disclose all material facts. See Securities and Exchange Commission v. Texas Gulf Sulphur Co., 401 F.2d 833, 848–849 (2d Cir. 1968), cert. denied sub nom., Coates v. Securi-

ties and Exchange Commission, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

In either role, Rizzo could not fulfill his obligation by remaining mute.

■ Rizzo's attempt to prove non-reliance is also futile. Where the wrong involves primarily a failure to disclose, "proof of reliance is not a prerequisite" to recovery. Affiliated Ute Citizens of Utah v. United States, *supra*, 406 U.S. at 153, 92 S.Ct. at 1472. All that need be shown is that the information withheld is "material in the sense that a reasonable investor might have considered [it] important in the making of [his] decision." *Id*. at 406 U.S. at 153–154, 92 S.Ct. at 1472. See Chasins v. Smith, Barney & Co., *supra*, 438 F.2d at 1171.

■ Applying this test in the instant case, the question becomes whether a reasonable man in Barthe's position "might" have acted differently if he had been informed that he was to contribute virtually all of IMT's funds, and that, largely because of his (Barthe's) contribution, Rizzo would get 11 times as many shares as he would. This Court is compelled to conclude that Barthe "might" have declined to risk $100,000 on a completely unsecured investment in such a venture.

### III.

■ Rizzo urges that, as an alternative to complete liability, the Court should find Barthe's investment to be divisible. He contends that since Barthe received a note for $93,000, that amount should be exempt from coverage of the securities laws.

Section 3(a)(10) of the Securities Exchange Act of 1934 provides in relevant part that, "The term 'security' means any note . . ." 15 U.S.C. § 78c(a)(10).

Although this Circuit has not ruled that all notes fall within the coverage of Section 3(a)(10),[1] it is clear that notes are frequently ruled to be securities.[2] The note in issue was not intended to evidence a personal loan issued for a private purpose. See Lino v. City Investing Co., 487 F.2d 689, 694 (3d Cir. 1973); Securities and Exchange Commission v. Fifth Avenue Coach Lines, Inc., 289 F.Supp. 3, 38–39 (S.D.N.Y. 1968), aff'd without consideration of the point, 435 F.2d 510 (2d Cir. 1970). To the contrary, the loan was meant to be seed money for a venture capital deal, and both parties were cognizant of this fact. *Cf*. Lino v. City Investing Co., *supra* 487 F.2d at 695. Under these circumstances, the note falls squarely under the protective umbrella of the securities laws.

### IV.

Barthe also seeks to hold Kern liable[3] for his loss under the theory that Kern is a "controlling person" within the meaning of Section 20(a) of the Securities Exchange Act of 1934.[4]

---

1. See the Court of Appeals' treatment in Movielab, Inc. v. Berkey Photo, Inc., 452 F. 2d 662 (2d Cir. 1971) of the lower court's decision, 321 F.Supp. 806, 808–810 (S.D.N. Y.1970). *But cf.*, Forman v. Community Services, Inc., 500 F.2d 1246, 1250–1252 (2d Cir. 1974); 1050 Tenants Corp. v. Jakobsen, 365 F.Supp. 1171, 1174 (S.D.N.Y.1973).

2. See Movielab, Inc. v. Berkey Photo, Inc., *supra*; Lehigh Valley Trust Co. v. Central Nat. Bank of Jacksonville, 409 F.2d 989, 992 (5th Cir. 1969); Prentice v. Hsu, 280 F. Supp. 384, 386 (S.D.N.Y.1968); Olympic Capital Corp. v. Newman, 276 F.Supp. 646, 653 (C.D.Calif.1967); Whitlow & Associates, Ltd. v. Intermountain Brokers, Inc., 252 F.Supp. 943, 947–948 (D.Haw.1966).

3. Although the complaint lacks any reference to Kern's participation, except for the statement that Rizzo was a registered representative of Kern, the evidence adduced at trial and the post-trial memoranda will be treated as an amendment of the complaint, in this instance as well. See *supra* p. 5.

4. 15 U.S.C. § 78t(a) provides that: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or any rule or regulation thereunder shall also be liable jointly and severally with and to the same ex-

In Lanza v. Drexel & Co., 479 F.2d 1277, 1299 (2d Cir. 1973), our Court of Appeals held that the purpose behind this section is "obviously to impose liability only on those . . . who fall within its definition of control and who are in some meaningful sense culpable participants in the fraud perpetrated by controlled persons." That Kern was a "controlling person" at the time the deal was consummated cannot be seriously questioned. See Lanza v. Drexel & Co., supra 479 F.2d at 1301; Gordon v. Burr, 366 F.Supp. 156, 168 (S.D.N.Y.1973); Securities and Exchange Commission v. Lum's, Inc., 365 F.Supp. 1046, 1063 (S.D. N.Y.1973). Cf. Moerman v. Zipco, Inc., 302 F.Supp. 439, 447 (E.D.N.Y.1969), aff'd, 422 F.2d 871 (2d Cir.), petition for reh. denied, 430 F.2d 362 (2d Cir. 1970). Thus, the only question is whether Kern sustained its burden of proving "good faith" as a defense to liability. See Securities and Exchange Commission v. First Securities Co. of Chicago, 463 F.2d 981, 987 (7th Cir. 1972), cert. denied sub nom., McKy v. Hochfelder, 409 U.S. 880, 93 S.Ct. 85, 34 L.Ed.2d 134 (1972); Gordon v. Burr, supra 366 F.Supp. at 168 n. 11.

The record discloses that Barthe looked primarily to Rizzo. During a period of two years, Barthe's account was transferred to each succeeding firm with which Rizzo became associated, and Barthe testified that he would have gone with Rizzo to any firm. Nevertheless, Kern was aware that it had the responsibility to protect all of its customers, and that Barthe was in this category. Thus, Kern had a rule that all deals involving private financing were to be presented to the president of the firm, Arthur M. Kern, for review. In fact, prior to the IMT deal, Rizzo had attempted to launch a private financing of Carlin Instruments Company and had induced Barthe to invest $25,000. When Rizzo came to Mr. Kern with the deal, he was sent to the law firm of Cole & Deitz, the attorneys for Kern. After their thorough review, Rizzo was told that Kern would not approve the deal and that he should return Barthe's money. Because of this experience, Rizzo was afraid to reveal the IMT deal to Kern, and therefore told Mr. Kern only that he had a private placement and that he therefore would resign from Kern. Mr. Kern told Rizzo to leave when he was ready.

The testimony that Rizzo never told Kern of Barthe's involvement in IMT, and that Barthe never came to Kern's offices or spoke to anyone at Kern about it, is without contradiction. The first conversation that Barthe had with Rizzo about IMT took place in Barthe's car; the next conversation took place after Barthe moved to Florida, when Rizzo came there to finalize the plans. When the $100,000 was finally withdrawn from Barthe's account, the notice stated "R. Barthe request. Check issued $100,000;" there was no indication that it was for anything but Barthe's use, and there was no complaint about its withdrawal. Moreover, there was nothing in Rizzo's prior behavior to alert Kern to any possibility that Rizzo would do anything but leave Kern when he got his private placement.

Since it is evident that Kern did not have actual notice of the IMT deal, the controlling inquiry must be whether sufficient precautionary measures were taken to prevent the loss. Lorenz v. Watson, 258 F.Supp. 724, 732 (E.D.Pa. 1966). See Securities and Exchange Commission v. Lum's Inc., supra.

In Securities and Exchange Commission v. Lum's Inc., it was considered significant whether the brokerage firm provided a compliance department which

tent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

had members who would meet periodically with the firm's salesmen to discuss problems of violations of the securities laws. Although no formal meetings were held at Kern, the registered representatives were reminded periodically of the regulations affecting their conduct. Furthermore, the rules of Kern governing its registered representatives and the rules and regulations of the New York Stock Exchange were set forth in printed material distributed by Kern to all its representatives. Moreover, there was a compliance officer who was designated to make spot checks of incoming mail and determine whether any account was being excessively traded.

█ Although the security standards were not as high as those of Lehman Brothers in Securities and Exchange Commission v. Lum's, Inc., this Court cannot conclude that under all the circumstances—especially in view of Rizzo's effort to keep the transactions covert—they show that Kern did not act in "good faith" or that it was in some "meaningful sense [a] culpable participant" in the wrong to Barthe. Therefore, I conclude that Kern has sustained its burden, and is not liable under Section 20(a).

### V.

Barthe is entitled to recover his damages resulting from Rizzo's violation of Rule 10b-5. Chasins v. Smith, Barney & Co., *supra* 438 F.2d at 1173. Since Barthe might never have invested in IMT at all, had there been full disclosure, he is entitled to recover his investment plus 6% interest from the date his funds were transferred. See Reube v. Pharmacodynamics, Inc., *supra* 348 F. Supp. at 915–916.

Plaintiff may prepare a judgment and submit it for consideration, on notice to defendants.

So ordered.