## SECURITIES AND EXCHANGE COMMISSION

v.

## ORANGE GROVE TRACTS
and
Albert F. Green.

Civ. A. 62–692–C.

United States District Court
D. Massachusetts.

Nov. 6, 1962.

Arthur F. Carr, Edward P. Delaney, Boston, Mass., for plaintiff.

Harold B. Dondis, Boston, Mass., Marvin I. Wiener, Miami, Fla., for defendants.

CAFFREY, District Judge.

This is a civil action brought by the Securities and Exchange Commission under Section 22(a) of the Securities Act of 1933, 15 U.S.C.A. § 77v(a), in which the Commission charges that the defendants, Albert F. Green, a resident of the State of Florida, and Orange Grove Tracts, a corporation organized under the laws of the State of Delaware in 1962, are engaged and are about to engage in acts and practices which constitute and which will constitute violations of Sections 5(a), 5(c), and 17(a) of the Act, 15 U.S.C.A. §§ 77e(a), 77e(c), and 77q(a). The Commission seeks temporary and final injunctive relief pursu-

ant to Section 20(b) of the Act, 15 U.S. C.A. § 77t(b).

The parties are in substantial agreement as to the facts which give rise to this controversy, and I find as follows:

1. The records of the Securities and Exchange Commission disclose that no registration statement has been filed with the Commission on behalf of Orange Grove Tracts.

2. Albert F. Green, of Miami, Florida, is President of defendant Orange Grove Tracts.

3. Orange Grove Tracts was incorporated under the laws of the State of Delaware in May, 1962.

4. Since on or about April 1, 1962, Orange Grove Tracts has been mailing sales literature to some 7500 persons throughout the United States. It has entered into contractual undertakings with 180 persons, who reside in approximately 35 States, including Massachusetts, the District of Columbia, and certain provinces of Canada. This sales literature consisted of:

a. A brochure bearing the letterhead "Orange Grove Tracts, P.O. Box 516, 2 Regent Street, Belize, British Honduras. U.S. Mailing Address: P.O. Box 566, Coral Gables, Florida."

b. A blank purchase agreement form entitled "Preview Reservation Form."

c. A map of British Honduras purporting to show the location of citrus land being offered for sale.

d. Four testimonial letters purportedly written by residents of British Honduras.

e. A Cooperative Growers Citrus Association booklet.

f. A copy of a letter dated January 7, 1962, addressed to Albert Green and purportedly written by Rudy Stock, Secretary and General Manager of Cooperative Growers Citrus Association, hereinafter referred to as CGCA.

5. The Orange Grove Tracts brochure represented that five citrus acres could be purchased for $595.00, $10 down and monthly payments of $15 for 39 months, or $562.25, a 5% discount, if a cash payment was made; that the citrus land for sale was located in British Honduras; that conditions in British Honduras, climatic and otherwise, were ideal for the production of citrus; that British Honduras had been noted mostly for timber until large corporations "began to scent ORANGE BLOSSOMS * * citrus dividends * * * MONEY * * * BIG MONEY!;" that previously only a few insiders knew about the citrus boom and only now could smaller investors cash in on it; that the demand for citrus exports from British Honduras was tremendous in Europe, Canada and the United Kingdom, and that according to one reliable estimate, five acres with citrus trees may be worth $17,500 in less than ten years. The brochure further represented that the land being offered for sale adjoins property managed by CGCA and was land that would be needed for more groves. The brochure referred to letters from "on-the-scene experts" as being enclosed and also called the reader's attention to the fact that there was also enclosed a CGCA booklet and a letter from CGCA explaining their services in detail.

6. The CGCA booklet stated, among other things, that CGCA would "provide expert management in the planting, maintenance, harvesting and marketing of fruit;" that this service would cost a grove owner $21.45/BH per month for 60 months; that income realized by a grove owner after the sixth year would be estimated to be $4,500/BH; by the tenth year, $8,000/BH; and after the tenth year, $14,000/BH.

7. The letter addressed to Alfred Green purportedly written by CGCA and dated January 7, 1962, referred to an inquiry by Green on January 2, 1962, requesting a commitment from CGCA to "develop and maintain five-acre orange groves in land situated in Section 132." The letter went on to say, "We are developing adjoining lands and are happy to submit to you the following commitment." The letter then continued to recite the terms of the commitment and

referred to the booklet more fully described in paragraph 6 above.

The position of the Commission, briefly stated, is that using the mails to distribute over 7,000 of the above-described documents constitutes the offering for sale and the selling of securities, namely, investment contracts, to wit, units of a citrus grove development coupled with a contract for planting, maintaining, harvesting, and marketing the fruit thereof; and in the offer for sale and the selling of such securities, the Commission says, the defendants have been and are now, directly and indirectly, making use of the means and instruments of transportation and communication in interstate commerce and of the mails to sell and offer to sell such securities and carry such securities and causing them to be carried through the mails and in interstate commerce.

Defendants, on the other hand, take the position that their activity amounts to merely the sale by them of real estate in British Honduras, citing in support of this interpretation of the economic activity involved herein Blackwell v. Bentsen, 5 Cir., 203 F.2d 690 (1953). The Supreme Court gave a very broad interpretation to the phrase "investment contract" as it appears in Section 5(a) of the Act, in S.E.C. v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), saying, at p. 298, 66 S.Ct. at p. 1102:

> " * * * an investment contract for purposes of the Securities Act means a contract, transaction or *scheme* whereby a person invests his money in a common enterprise and *is led to expect profits* solely from the efforts of the promoter or a third party * * * Such a definition * * * permits the fulfillment of the statutory purpose of compelling full and fair disclosure relative to the issuance of 'the many types of instruments that in our commercial world fall within the ordinary concept of a security.' * * * It embodies a flexible rather than a static principle, *one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.*" (Emphasis added.)

Defendants argue that their activities are not proscribed by Section 5(a) even in the light of the Howey decision because the addressees of defendant's literature are under no legal obligation to employ the services of CGCA or any other management company.

██ The short answer to this is that a fair reading of their literature does lead the recipient to expect profits, not from his own future efforts in distant British Honduras, but from the efforts of a third party already on the scene. The fact that that third party may be legally distinct from the defendants does not bring the activity outside the coverage of Section 5(a). See D. H. Roe v. United States, 287 F.2d 435 (5 Cir.), cert. den. 368 U.S. 824, 82 S.Ct. 43, 7 L. Ed.2d 29 (1961), where the Court said, at p. 439, " * * * *it mattered not whether the test wells were to be drilled by the sellers, or by third persons either under, or independent of, their control.*" (Emphasis added.)

The language of the Supreme Court in the Howey case, supra, 328 U.S. at p. 299, 66 S.Ct. at p. 1103, would seem to be a perfect description of the economic activity reasonably contemplated by the investors who received mail solicitations from the defendants:

> "They are offering an opportunity to contribute money and to share in the profits of a large citrus fruit enterprise * * * They are offering this opportunity to persons who reside in distant localities and who lack the equipment and experience requisite to the cultivation, harvesting and marketing of the citrus products. Such persons have no desire to occupy the land or to develop it themselves; they are attracted solely by the prospects of a return on their investment."

I rule that by using the mails to distribute the above-described written matter the defendants are offering to sell a security as to which a registration statement has not been filed with the Securities and Exchange Commission, and that the defendants thereby are in violation of Sections 5(a), 5(c) and 17(a) of the Securities Act of 1933, as amended.

The motion for preliminary injunction is allowed.