IRA HOWARD SHINBERG *vs.* GEORGE L. GARFINKLE.

Suffolk. January 4, 1972. — February 8, 1972.

Present: TAURO, C.J., CUTTER, QUIRICO, BRAUCHER, & HENNESSEY, JJ.

*Partnership*, What constitutes. *Joint Enterprise*. *Trust*, Constructive trust. *Deceit*. *Equity Pleading and Practice*, Rehearing.

Where the plaintiff in a suit in equity agreed to advance money to a business of which the defendant was a trustee on the basis of a written agreement in which the defendant promised to repay the advance and share equally with the plaintiff his portion of the trust's profits, if any, after the advance was repaid, the agreement constituted a single, limited investment and not a partnership between the plaintiff and the defendant because they were not associated to carry on as co-owners a business for profit. [114–115]

Even if an agreement, by which the plaintiff in a suit in equity was to advance a sum of money to a business to which the defendant was contributing his services and by which a contingent profit-sharing relationship between the parties was established, did not create a joint venture, an express provision requiring the defendant to disclose all financial records of the business to the plaintiff as well as to notify him of all disbursements to any of the parties to the business imposed a contractual, if not quasi-fiduciary, duty upon the defendant to make full, truthful disclosures of the records and disbursements to the plaintiff. [115]

Where an escrow agreement including deposit of a release, made between the releasor and the releasee in a settlement of claims under a previous investment agreement between them was entered into by the releasor in reliance on false statements of facts made by the releasee, the escrow agreement and release were not binding on the releasor and he was entitled to enforce the original investment agreement. [115–116]

Where a master's findings on damages were confused and obscure, either party was entitled, in the discretion of the trial court, to a rehearing on the issue of damages. [116–117]

BILL IN EQUITY filed in the Superior Court on October 10, 1967.

The suit was heard by *Tomasello, J.*, on a master's report.

*Irving Marmer* for the defendant.

*Albert D. Boulanger* (*Ira H. Shinberg* with him) for the plaintiff.

CUTTER, J.   Mr. Shinberg, an attorney, by this bill in equity seeks an accounting from Garfinkle, a Boston architect, with respect to transactions in 1965, and thereafter, involving construction of a nursing home in Cambridge.   The case was referred to a master, whose report, once recommitted to him, was confirmed.   Garfinkle has appealed from a final decree (a) stating that Garfinkle holds, as constructive trustee for Mr. Shinberg, all the trust certificates of Shirson Realty Trust, which owns the nursing home, and all the stock of Sonley Corporation, which operates the home, and (b) ordering Garfinkle to pay to Mr. Shinberg $145,894.64, said by the decree to represent the profit made by Garfinkle in the enterprise described below, plus interest and costs.   The facts are stated on the basis of the pleadings and the master's report as supplemented after recommittal.

Mr. Shinberg and Garfinkle, friends for several years, had discussed nursing homes as an investment.   About May 4, 1965, Garfinkle by telephone told Mr. Shinberg of "an opportunity to participate in a Cambridge [n]ursing [h]ome venture."   Garfinkle needed $25,000 to do so.  "He requested . . . [Mr. Shinberg] to advance that sum."  The next day Garfinkle met with Mr. Shinberg and his father, a doctor.   "Garfinkle outlined the business venture" and said "that, if he received $25,000, he would . . . share his interest with [Mr.] Shinberg on a 50–50 basis" and "that once a permanent mortgage was placed . . . the $25,000 would be refunded."   Nathan Korff and Dr. Frederick P. Nadel were to be other investors, but "wished to do business only with Garfinkle."

On May 7, 1965, a memorandum agreement, prepared by Mr. Shinberg, was made.[1]   This recited, among other matters, (a) that $25,000 had been advanced by Mr. Shinberg to Garfinkle; (b) that the building permit had

---

[1] A copy was attached to Mr. Shinberg's bill.  Garfinkle's answer in effect admitted the contents of the document although he (1) denied the description of it as a "memorandum of agreement" and (2) averred that it "was in fact the contract between the parties and contained all representations between the parties."

been granted and all plans had been approved; (c) that a $400,000 bank mortgage had been placed; (d) that there was a firm bid to build the home for $288,000; (e) that the cost or approximate cost of land, demolition, and furnishings had been determined; and (f) that there had been approaches by a prospective purchaser.[2]  The agreement then proceeded, somewhat ambiguously, to deal with a part at least of Garfinkle's obligations to Mr. Shinberg in the manner set out in the margin.[3]

Garfinkle, Nadel, and Korff opened a bank account with a deposit of $75,000 representing a one-third capital contribution by each.[4]  On May 28, 1965, GKN Realty Trust (see fn. 3) was formed.  The necessary papers were recorded on June 1, and transferable certificates "were issued to each of the principals" (i.e. Garfinkle, Korff, and Dr. Nadel).  Garfinkle received his certificates in June, 1965.  There was "no express written agreement between the parties for Garfinkle to deliver . . . certificates."  Mr. "Shinberg asked Garfinkle on more than one occasion for the certificates and Garfinkle said he was only one of three trustees and was without power to issue

---

[2] It stated also that "[a]ll services provided by any of the original joint venturers have been and will remain without compensation" and that "[t]he other two partners will be present at closing each with his $25,000."

[3] "10. . . . Garfinkle shall turn over any and all funds to . . . [Mr.] Shinberg until . . . $25,000 which has been advanced has been repaid. Once . . . $25,000 . . . has been repaid the two . . . parties will share all profits or funds to be paid out by GKN Realty Trust equally.  The same holds true for the Corporation.  11.  Any future funds that may prove necessary in this venture to maintain the . . . Garfinkle one-third share shall be advanced by . . . Garfinkle up to . . . $25,000. . . .  12.  In the event that at the end of one year from the signing of this agreement unless sooner determined any losses have occurred . . . Garfinkle will indemnify and repay (½) of said losses, that is up to a sum not in excess of $12,500 . . . .  13. . . . Garfinkle shall make known the existance [*sic*] of this agreement to all members of the Realty Trust.  14. . . . Garfinkle shall turn over to . . . [Mr.] Shinberg all copies of the records of both the Realty Trust and Corporation.  He will further make known all disbursements especially to any of the parties."

[4] On the trust's books, the $25,000 paid in by each shareholder was recorded, as an accounting matter, as a capital contribution of $5,000 and as a loan of $20,000.  For some not at all clearly explained reason, the master followed testimony of an accountant for Garfinkle, Korff, and Dr. Nadel, in treating the original investment of each of them as $24,850, rather than $25,000.

them." In June, 1965, Garfinkle in fact had signed a request (which the other trustees refused to sign) that trust certificates be issued to Mr. Shinberg and his nominee. The master found that "Garfinkle agreed to turn over to [Mr.] Shinberg a one-half . . . share of his . . . [own] shares in the GKN Trust when the shares were issued."

Beginning in the fall of 1965, Mr. Shinberg and Garfinkle made weekly trips to the construction site during which the former renewed his request for the issuance of shares and the return of funds advanced by him. By December, 1966, Mr. Shinberg was "fed up" with the transaction. Garfinkle then offered Mr. Shinberg, apparently in settlement of all claims, a total of $30,500 payable $15,000 in cash and the rest in notes. On December 22, 1966, Mr. Shinberg executed a release to Garfinkle and delivered it, subject to an escrow agreement that it would be delivered when full payment (apparently of Garfinkle's offered settlement) had been made, either on the due date of the notes or when the nursing home was sold, whichever date first occurred.

Prior to December 22, 1966, Garfinkle had paid $3,350 to Mr. Shinberg. Under the escrow agreement Mr. Shinberg, at the time of the master's report, had received $22,500. The total received by Mr. Shinberg since the inception of his dealings with Garfinkle is $25,850. Mr. Shinberg now holds Garfinkle's notes in the aggregate sum of $8,000.

In April, 1967, the nursing home was sold to Milton Richmond, a friend of Garfinkle, and Bernard L. Shapiro as trustees of the Shirson Realty Trust. Mr. Shinberg first learned of the sale in August, 1967. He asked Garfinkle why the terms of the escrow agreement had not been carried out. He was then told by Garfinkle that "no sale had been made because he had purchased the nursing home." [5]

---

[5] Later on April 5, 1968, Garfinkle did become the sole owner of (a) the stock of Shirson Realty Trust which owned the home and (b) all the stock of Sonley Corporation which operated the home.

On September 25, 1967, Mr. Shinberg wrote to Garfinkle, with a copy to the escrow agent, that because there had been a breach of the escrow agreement he was making demand under the terms of the original agreement of May 7, 1965 (see fns. 1–3, *supra*). The escrow agent, without consulting Garfinkle, returned to Mr. Shinberg the release which had been held under the escrow agreement.

The question then arose whether the escrow agreement was enforceable. The master found that Garfinkle made false statements to Mr. Shinberg (a) that the nursing home was not for sale "at a reasonable price" (whereas it was for sale and, indeed, was sold in April, 1967); (b) that he (Garfinkle) had not received funds from the trust (whereas $26,600 had been paid to him on or before January 10, 1966); and (c) that no trust certificates had been issued to him (Garfinkle), when in fact such certificates had been issued in June, 1965. The master found that Mr. Shinberg in December, 1966, "felt he had made a bad deal" and "was relying exclusively upon Garfinkle's representations as to [the] status of the venture ... which representations ... were not true." Mr. Shinberg was in no position to learn anything regarding the GKN Trust because he was not a trustee or a certificate holder. He relied fully upon Garfinkle for all information.[6] "Garfinkle was not in control of the trust books."

The master concluded, without sufficient explanation, that the "gross profit" to each trustee (Garfinkle, Korff, and Dr. Nadel) was $112,702.26. This sum, reduced by $24,850 (see fn. 4, *supra*), left a net profit of $87,852.26. Half of this amount would be $43,926.13.[7]

1. Garfinkle contends that the master's report on its

---

[6] The master also found that Garfinkle had disagreements with Korff and Dr. Nadel. These were "with the intent of having Korff and Dr. Nadel lose interest and enthusiasm in the ... venture." He delayed indorsing certain checks after the home had been sold in April, 1967, for a similar purpose.

[7] The master separately found, without adequate explanation, that Garfinkle, Korff, and Dr. Nadel each "received back $5,000 from the initial investment of $75,000 which was not included in the foregoing figures."

face contains inconsistencies which indicate its unreliability. See *Gil-Bern Constr. Corp.* v. *Medford,* 357 Mass. 620, 623.   See also *P & D Serv. Co. Inc.* v. *Zoning Bd. of Appeals of Dedham,* 359 Mass. 96, 98.   The report in various respects is confusing, diffuse, and repetitive. This confusion, however, arises principally with respect to the issue of damages, discussed below.   In other respects, enough can be determined from the findings to permit us to decide at least the issues other than damages.

2.  Mr. Shinberg takes the position that the memorandum agreement or contract of May 7, 1965, created a partnership or joint venture between him and Garfinkle and that, for that reason, Garfinkle owed him a fiduciary duty.   We are of opinion that no partnership was created by the May 7, 1965, agreement, which nowhere uses the word "partnership" with respect to Garfinkle's relationship to Mr. Shinberg (although it apparently uses the term with respect to Garfinkle, Korff, and Dr. Nadel, to whom in another paragraph it refers as "the original joint venturers").   Whatever relationship there was between Mr. Shinberg and Garfinkle was for a single, limited investment by the former, rather than for the joint conduct of a continuing business.   Mr. Shinberg and Garfinkle were not associated "to carry on as co-owners a business for profit," particularly prior to the repayment of Mr. Shinberg's advance of $25,000.   See G. L. c. 108A, § 6 (1) and § 7 (4) (a).

The arrangement in some respects resembles a joint venture.   See *Cardullo* v. *Landau,* 329 Mass. 5, 8–9, and cases cited.   See also *Air Technology Corp.* v. *General Elec. Co.* 347 Mass. 613, 625–626; Williston, Contracts (3d ed.) §§ 318–318A.   Cf. *DeCotis* v. *D'Antona,* 350 Mass. 165, 168.   The somewhat loosely drawn agreement of May 7, 1965, however, shows no specific intention to create a joint venture.   A statement of any such intention would have been natural in view of the reference (already mentioned) to Garfinkle, Korff, and Dr. Nadel as the "original joint venturers."   To be sure, Mr. Shinberg was advancing (or lending, although the contract

does not refer to Mr. Shinberg's advance as a loan) $25,000 to the enterprise and Garfinkle was contributing services. Garfinkle was also bound to advance up to $25,000 to maintain his one-third share in the enterprise. There were provisions for a limited payment of losses by Garfinkle and at least a contingent sharing of profits by both Garfinkle and Mr. Shinberg.

Even if this arrangement did not amount to a joint venture, there was in the agreement of May 7, 1965, the express provision of par. 14 (fn. 3, *supra*) that "Garfinkle shall turn over to . . . [Mr.] Shinberg all copies of the records of both the Realty Trust and [the operating] Corporation" and will "make known all disbursements especially to any of the parties." Even though this provision was drafted by Mr. Shinberg and, as somewhat ambiguous, may be construed against him, we conclude that it imposed a contractual, if not a quasi-fiduciary, duty upon Garfinkle to make full, truthful disclosure of the records and disbursements of the trust and operating corporation to Mr. Shinberg, who (as the master found) was relying on him to do so. Particularly is this so where Garfinkle failed to deliver the one-half of one-third of the realty trust shares (one-sixth of the total shares) which he had separately promised to Mr. Shinberg and had obtained or could have obtained. Even though the master found that Garfinkle did not control the trust books, he could have had or secured access to them. The situation has sufficient similarity to the situation considered in *Broomfield* v. *Kosow*, 349 Mass. 749, 754, to lead us, in the circumstances, to hold Garfinkle to a duty of truthful disclosure.

3. The master's findings sufficiently establish misrepresentations to Mr. Shinberg by Garfinkle (a) that the nursing home was not for sale, (b) that he (Garfinkle) had not received funds from the trust, and (c) that certificates had not been issued to him. Each of these misrepresentations, particularly the last two of them, was in some degree relevant to Mr. Shinberg's decision whether to make a settlement with Garfinkle and give him a

release upon receiving specified payments. The master has found that these false statements were relied on by Mr. Shinberg, and in context the findings must be taken as establishing that they led Mr. Shinberg to execute the escrow agreement of December 22, 1966. We conclude that this escrow agreement (and the deposited release) are not binding on Mr. Shinberg. He may enforce his original agreement.

4. Mr. Shinberg in enforcing the original agreement of May 7, 1965, is limited by the terms of that agreement. He is to receive back (including prior payments and appropriately taking into account the existence or payment of the $8,000 of Garfinkle's notes) a total of the following: $25,000 plus one-half of Garfinkle's profits (above $25,000) from the nursing home and its sale to Shirson Trust in April, 1967. By that time, the enterprise (whatever its nature) entered upon by Mr. Shinberg and Garfinkle had clearly ended. What happened to the home after that, so far as we can ascertain from the master's report, is irrelevant. Cf. *DeCotis* v. *D'Antona,* 350 Mass. 165, 168.

The master has found that the profit (after deducting $24,850) see fn. 4, *supra,* to each trustee (presumably including Garfinkle) was $87,852.26. One-half of this sum is $43,926.13. If the parties are prepared to accept this figure as the limit of Mr. Shinberg's proper claim to a one-half share of the profits, that amount may be allowed. We see no basis for requiring Garfinkle to hold all of his one-third of the Trust shares (or their proceeds) for Mr. Shinberg's benefit as constructive trustee. Garfinkle, we think, is accountable at most only for the more limited interest he undertook to give to Mr. Shinberg under the agreement of May 7, 1965.

5. The master's findings on damages are confused and obscure. It is far from clear whether there should be deductions from, or additions to, the figure of net profit received by each trustee of $87,852.26, because of (a) a refund of "$5,000 from the initial investment of $75,000 . ... not included in" the net profit computation (see

master's finding, no. 80) ; (b) $5,000 architectural fees and $3,000 land costs paid to Garfinkle; and (c) confusion in the master's original findings (see especially those numbered 71, 72 and 77) which leave indefinite precisely what the facts are and their significance. If either Mr. Shinberg or Garfinkle so requests, there may be, in the discretion of the Superior Court, a rehearing of the issue of the profits realized by Garfinkle from the sale of the nursing home to Shirson Realty Trust, before the court, the master, or a new master, in the discretion of the Superior Court. The present report provides an unsatisfactory basis for determination on this issue. See *Watkins* v. *Simplex Time Recorder Co.* 316 Mass. 217, 224–225; *Provost* v. *Pawlowski,* 359 Mass. 625, 627.

6. The final decree is reversed. The case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*