Judy KRAVITZ

v.

PRESSMAN, FROHLICH & FROST, INC., et al.

Civ. A. No. 74–5222–T.

United States District Court, D. Massachusetts.

Feb. 15, 1978.

Choate, Hall & Stewart, Weld S. Henshaw, Owen S. Walker, Boston, Mass., for plaintiff.

George R. Desmond, Framingham, Mass., for Ronald Contrado.

Robert Sullivan, Herrick, Smith, Donald, Farley & Ketchum, Gerald F. Rath, Boston, Mass., for Bache & Co., Inc.

William M. Prifti, Herbert S. Cohen, Boston, Mass., for Pressman, Frohlich & Frost.

## MEMORANDUM

TAURO, District Judge.

Plaintiff relies on the Securities Act of 1933 and the Securities and Exchange Act of 1934 [1] to recover money invested with the defendant brokerage firm (Pressman), as well as commissions paid by her to that firm. Plaintiff's theory is that she was defrauded by Ronald Contrado while he was employed as a stockbroker by Pressman.[2]

---

1. 15 U.S.C. §§ 77a et seq.; 15 U.S.C. §§ 78a et seq.

2. Contrado was originally named as a defendant, as was a former employer of his, the brokerage firm of Bache, Halsey, Stuart, Inc.

(Bache). Plaintiff discontinued against Contrado, because of his apparent insolvency, and settled with Bache. Pressman's cross-claim against Contrado was severed by this court.

## I.

After a bench trial, the court makes the following findings of fact, based on its evaluation of the testimony and the documentary evidence.[3]

In June, 1971, shortly after the death of her father, plaintiff Judy Kravitz moved to Boston from her home in Cleveland, Ohio. She was 24 years old, single, and a graduate of Ohio State University with a B.S. degree in elementary education. She had no investment experience. Her sole assets were $18,000 and a car.

During the summer of 1971, she was introduced to Contrado by a mutual friend, and saw him once or twice a week until November, 1971. They became close friends. Further, plaintiff decided, on the recommendations of mutual friends, to let Contrado handle her personal affairs.

At the time, Contrado was employed as a registered representative with Bache. On or about December 10, 1971, Contrado opened a securities brokerage account at Bache in plaintiff's name with $300 received from her. She was then employed at an annual salary of $7500 as a school teacher in Brockton, where she had been hired in September 1971. Prior to the account being opened, plaintiff discussed her investment purposes with Contrado, and told him that she wanted to do something safe so that her money would last a long time.[4] Because plaintiff was extremely anxious about preserving her savings, Contrado had guaranteed that he would reimburse her if she suffered any losses. She testified that she would not have opened the account had she not been reasonably certain she would not lose anything.

Between January 1, 1972 and November 30, 1972, plaintiff deposited in her Bache account additional sums totaling approximately $18,000, representing substantially all her assets. Thereafter, plaintiff relied entirely on Contrado's investment judgment and experience, and allowed him to make all investment decisions with respect to her Bache account. She remained unfamiliar with operation of the stock market, such as brokerage accounts, margin trading, day trading, short sales, and puts and calls.

Plaintiff received by mail at her home confirmation slips reflecting each transaction of purchase and sale in her account and a statement from Bache summarizing the monthly trading activity. Those that she opened she did not understand. Eventually she ceased opening such mail.

Whenever she asked questions of Contrado concerning her account, he would tell her that it was fine. If she pressed him for information, he would display anger and tell her that he was acting in her best interests.

During the eleven months plaintiff's account was at Bache, Contrado, acting in his sole discretion, engaged in a substantial

---

**3.** At the conclusion of the trial, the record was left open for a period of two weeks, and the parties submitted additional documentary evidence. The court makes the following evidentiary rulings.

Plaintiff offered the affidavit of Contrado, July 19, 1976, submitted in *Auerbach v. Contrado*, No. 683539, Superior Court of Suffolk County, Massachusetts. The court sustains the objection of the defendant.

Defendant offered as exhibits K 1–10, L 1–7, S 1–20 and T 1–14, a series of checks made out by defendant Contrado to plaintiff, from Contrado's parents to plaintiff and from Contrado to his parents. The plaintiff's objections to the admission of all of these are sustained. In addition, the plaintiff's objection to defendant's offer of exhibit U, and option agreement, is also sustained.

Defendant's exhibits V 1–4, photocopies of certain rules of the New York Stock Exchange, and of sections of the Rules of Fair Practice of the National Association of Securities Dealers, are admitted into evidence.

**4.** Contrado's testimony that the plaintiff wanted to make more on her capital than the 5% which she could receive in the bank is not in conflict with the basically conservative investment objectives which plaintiff stated repeatedly throughout her testimony.

volume of trading on her behalf.[5] The trading consisted of purchases and sales, including short sales of speculative securities, as well as puts and calls. A high volume of commissions was generated, unrelated to the profitability of plaintiff's account. Plaintiff was unable to keep up with or understand the activity in her account, as reflected by mailings from Bache. As a result, she ceased reading such mail.

At some time after opening plaintiff's Bache account, Contrado transferred into it funds acquired by him from his father. These deposits amounted to $32,530.

When plaintiff questioned this practice, Contrado said that putting his father's money in her account would have the effect of offsetting any decrease in her account's value.

There was no understanding between plaintiff and Contrado that they were operating her account as a partnership or joint venture, or that they would split profits and losses equally. Rather, the agreement between plaintiff and Contrado was that he would cause money to be contributed to her account, thereby providing a cushion against any decrease in its value. Plaintiff was to receive profits only on the basis of her $18,000. She was to be reimbursed for any decrease in the value of her $18,000 investment. Contrado was to receive any profits from investment of any funds in excess of $18,000, as well as all commissions generated by the account.

Sometime in early May 1972, plaintiff received a letter from a Bache branch manager calling to her attention that the trading activity in her account was substantial, and had generated commissions of $8,100, even though there had been no substantial profit or loss to her. The branch manager's letter to plaintiff was consistent with sound practice in the brokerage business. The letter concerned plaintiff. She visited Contrado at the Bache office and told him of her concern. Contrado appeared angered by plaintiff's inquiry and told her that he was acting in her best interests. Contrado then told plaintiff that she should tell the branch manager that she understood what was going on in her account, and that she understood the contents of the monthly statements she received. Plaintiff was then presented to the branch manager and told him what Contrado had instructed her to say. She did so because she trusted Contrado and felt he knew more than she did about financial matters. Later, plaintiff signed a letter typed by a Bache secretary, indicating that she understood the risks of the trading in her account, as well as her intention to reduce the volume of her trading.

Thereafter, trading in plaintiff's account did fall off. The branch manager continued to correspond with plaintiff offering advice and assistance. No trades occurred in plaintiff's account after September 1972, and there were no losses in the account when it was closed during December 1972.

In December 1972, Contrado became employed as a registered representative at the Boston office of defendant Pressman. Shortly thereafter, plaintiff's account at Bache was transferred to defendant Pressman's Boston office where it was handled by Contrado. Plaintiff's investment objectives remained the same as they had been at Bache. The same arrangement between plaintiff and Contrado existed as when the account had been at Bache. As of February 1973, the net equity in the account was approximately $21,500.

5. Monthly trading of her account during 1972 was as follows:

| Transactions | |
|---|---|
| January | 34 |
| February | 47 |
| March | 41 |
| April | 30 |
| May | 16 |
| June | 3 |
| July | 2 |
| August | 31 |
| September | 21 |
| October | 0 |
| November | 0 |
| December | 0 |
| | 225 |

After the transfer from Bache to Pressman, plaintiff's account again reflected a pattern of frequent trading.[6]

Contrado traded securities on margin for plaintiff's account, often buying and selling the same security within periods of a week or less, despite little or no change in market price. Total sales during 1973 aggregated $615,890. Purchases totaled $572,835. Brokerage commissions resulting from these transactions were approximately $21,000.

Plaintiff's expert witness, John Spooner,[7] testified that the number of transactions in plaintiff's account at Pressman during 1973 was unreasonable and excessive in light of her financial resources and experience, and her investment needs and objectives.[8]

The pattern of trading in plaintiff's account should have been detected by Pressman's regulatory or management staff much sooner than it was. The Pressman branch manager should have reviewed the trading in plaintiff's account, and should have been alerted to the low profits and losses and high commissions. Given such a trading pattern, Pressman's branch manager should have questioned Contrado and contacted plaintiff directly. The fact that plaintiff had once been warned by Bache concerning a similar trading pattern did not relieve Pressman from this responsibility.

Plaintiff continued to receive by mail at her home confirmation slips reflecting each purchase and sale, as well as monthly statements from the clearing broker for Pressman. Much of the mail was left unopened.

Plaintiff did realize, however, that there were a great number of trades, and she again asked Contrado about them. Contrado's response was to demonstrate anger at being questioned, and to say that he was acting in her best interests. She accepted his explanation and continued to trust him.

Contrado continued to make all decisions about plaintiff's account. Money was deposited into plaintiff's Pressman account, without her knowledge, that came from Contrado's parents, and from his own funds. Plaintiff also gave Contrado signed blank checks to use in making deposits to her account at Pressman. They made this arrangement because her working schedule made it difficult for her to come into the Pressman office during the day.

Pressman relied on Contrado for substantially all essential information as to plaintiff's financial resources, investment experience and objectives. The new account form, the primary source of information about plaintiff, was not signed by her. At no time did a Pressman representative, other than Contrado, interview plaintiff to obtain background information.

Evidence about supervisory procedures at Pressman was introduced primarily through the testimony of Edward Bond, who was

---

6. Monthly trading of plaintiff's account at Pressman during 1973 was as follows:

| | Transactions |
| --- | --- |
| January | 24 |
| February | 5 |
| March | 21 |
| April | 3 |
| May | 20 |
| June | 2 |
| July | 6 |
| August | 9 |
| September | 69 |
| October | 85 |
| November | 42 |
| December | 6 |
| | 292 |

7. John Spooner is vice-president of a Boston brokerage firm, Shearson, Hayden, Stone.

8. Even during months when the number of transactions was not great, the speculative nature of the securities bought and sold, the rapid turnover in the account, the "in-and-out" trading in the same securities, and the margin and option trading were all unreasonable in light of plaintiff's background, investment experience, assets and objectives. As an example of the in-and-out trading, the plaintiff's January 1973 statement indicates that 200 shares of stock of the WTSLTV Corporation were bought on January 4, 1973 at $3\frac{5}{8}$ and sold at the same price on January 22 and that the 100 shares of Buttes Gas & Oil bought on January 17 for 25 were sold on January 22 at 24. Spooner also testified that for a customer like plaintiff, it would have been proper to purchase dividend issuing stocks. This was rarely done. Those stocks that did issue dividends were not held long enough for plaintiff to receive any dividends from them.

employed by Pressman from March 1971 through December 1973 in various positions ranging from Chief Operating Officer and President to Corporate Secretary. During the time that plaintiff had her account with Pressman, Bond was the "titular head of compliance." Bond testified that management or compliance personnel visited the branch offices every two to three months to check the office, discuss problems with the branch manager and oversee correspondence. Management distributed a registered representative manual to its salespeople, outlining appropriate procedures. Each branch manager held monthly compliance conferences with their registered representatives.

According to Bond, the New York compliance staff examined the accounts of customers on a monthly basis for irregularities, including excessive or inappropriate trading. Information on trading would be received 30 to 60 days after it occurred. When irregularities were noticed, the standard procedure was for the branch manager to talk to the registered representative and the customer, to obtain a signed "risk letter" or trading authorization from the customer, and then to monitor the account.

Mr. Bond testified that he did not consider the trading in plaintiff's account excessive during January and March 1973. His understanding, based on her unsigned new account form, was that she was interested in a trading account. Bond did, however, alert Pressman's regional manager to excessive trading in accounts managed by Contrado. Bond also asked the regional manager to scrutinize the latter's accounts.

Bond first realized in November, 1973 that the Kravitz account was in bad shape. He then contacted the regional manager both by telephone and memorandum, telling him to monitor the account. Bond then arranged for Contrado to come to New York. Bond admonished Contrado with respect to the excessive trading, and restricted him in the type of trading he could do in the Kravitz account, as well as three others.

In December 1973, defendant Contrado was discharged from employment with Pressman. Shortly thereafter plaintiff was informed by Pressman that her account was almost without value. Plaintiff did receive approximately $500 when her account was finally closed. As a result of the trading in her Pressman account, plaintiff lost substantially the entire amount of her original investment with defendant Pressman, except for $1800 received while the account was open, and the aforementioned $500 received after the account was closed. As a result of this loss, plaintiff was forced to discontinue her studies at the Massachusetts College of Pharmacy, where she had enrolled in September 1973.

## II.

Defendant Pressman urges that plaintiff and Contrado were partners, engaged in churning her account, in violation of the rules of the New York Stock Exchange and of the Rules of Fair Practices of the National Association of Securities Dealers,[9] and that plaintiff is therefore estopped from pursuing a claim based on churning.

 This court has determined that the relationship between plaintiff and Contrado was not that of a partnership.[10] Whether such a partnership existed is a question to be determined on the basis of state law. *Powers v. Celebrezze*, 230

---

**9.** Rule 423 of the New York Stock Exchange prohibits a member from directly or indirectly holding an interest or participating in any joint account for buying or selling any security on the Exchange unless such joint account is reported to and not disapproved by the Exchange. Article III, § 19(f) of the Rules of Fair Practice of the NASD prohibits the sharing of profits or losses by a salesman in a customer's account without permission of the brokerage firm.

Rule 342 of the New York Stock Exchange establishes procedures relative to supervision and control of members and employees, as does Article III, § 27 of the Rules of Fair Practice of the NASD.

**10.** See court's findings in this regard, *supra* at 6. Even if there had been a partnership between plaintiff and defendant Contrado for the purpose of operating her account, Pressman would still be liable to plaintiff. *See* section IV *infra*.

F.Supp. 81 (D.N.D.1964); *In re Hare*, 205 F.Supp. 881 (D.Md.1962). In Massachusetts, "[a] partnership is an association of two or more persons to carry on as co-owners a business for profit." Mass.Gen.Laws ch. 108A, § 6(1).

■ Mere participation in profits is not sufficient to create a partnership. *Rosenblum v. Springfield Produce Brokerage Co.*, 243 Mass. 111, 137 N.E. 357 (1922). "A partnership imports an agreement of the parties to become partners." *Brodie v. Donovan*, 298 Mass. 69, 9 N.E.2d 386 (1937). A partnership must be characterized by a "voluntary contract of association for the purpose of sharing the profits and losses, as such, which may arise from the use of capital, labor or skill in a common enterprise, and an intention on the part of the principals to form a partnership for that purpose." *Boyer v. Bowles*, 310 Mass. 134, 37 N.E.2d 489 (1941); *Mitchell v. Gruener*, 251 Mass. 113, 146 N.E. 252 (1925). A partnership connotes the presence of a "community of property, community of interest and community of profits." *Rosenblum, supra.* Consequently, a partnership arises only where the parties intend to associate themselves as partners. *Shinberg v. Garfinkle*, 361 Mass. 110, 278 N.E.2d 738 (1972); *Cardullo v. Landau*, 329 Mass. 5, 105 N.E.2d 843 (1952).

Focusing on the facts of this case, Contrado testified that he and plaintiff had an explicit understanding, from the time her account was opened, that it would be operated as a partnership, even though to do so would be in violation of the rules of the New York Stock Exchange, and the Rules of Fair Practice of the National Association of Securities Dealers. The plaintiff testified that she never had any discussions with the defendant about operating as a partnership. Rather, she claimed that he simply agreed to put money belonging to his father into her account to act as a cushion against any losses. Both of them understood that she would receive only the profits attributable to her contributions to the account; that Contrado would receive commissions; and that he would make all decisions.

■ As the party asserting the existence of the partnership as part of its affirmative defense, the defendant bears the burden of showing its existence. *Willett v. Rich*, 142 Mass. 356, 7 N.E. 776 (1886); *Reilly v. Selectmen of Blackstone*, 266 Mass. 503, 165 N.E. 660 (1929). I conclude that the evidence does not support a finding that the parties intended to form either a partnership,[11] or a joint venture.[12]

### III.

The gravamen of plaintiff's complaint is that defendant Contrado employed a scheme to defraud plaintiff, in that he "churned" her account, in violation of Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q, and Sections 10(b) and 15(c)(1) of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78j, 78o and Rules 10(b)(5), 15(c)(1)(2) and 15(c)(1)(7)(a); in violation of Mass. Gen. Laws ch. 110A, § 101; and in violation of the National Association of Securities Dealers' Rules of Fair Practice, Ar-

**11.** This is a situation where the law requires a determination as to the intent of the parties when neither of them had an intent as that term is defined by law. The situation is like the following hypothetical:

> [T]here are innumerable instances in which a person's "intent" is crucial despite the fact that he or she may have had no intent at all in the sense contemplated by rules of law. For example, a German writer, considering the question of intention as a test of legal consequences, suggests the following situation. A young man and a young woman decide to get married. Each has $1000. They decide to begin a business with those funds, and the young woman gives her mon-

ey to the young man for that purpose. Was the intention to form a joint venture or a partnership? Did they intend that the young man be an agent or a trustee? Was the transaction a gift or a loan? Most likely, the young couple's state of mind did not conform to any of the modes of "intention" that the law might look for.

M. Freedman, Lawyers' Ethics in an Adversary System 70 (1975), *citing* K. Wurzel, Das Juristische Denken 82 (1904), translated in L. Fuller & R. Braucher, Basic Contract Law 67 (1964).

**12.** The same standards of intent apply for determining the existence of a joint venture. *Cardullo v. Landau*, 329 Mass. 5, 105 N.E.2d 843 (1950).

ticle III, Section 2. The plaintiff alleges that defendant Pressman is responsible for Contrado's action under Section 20 of the Securities and Exchange Act of 1934, 15 U.S.C. § 78t, and under the doctrine of *respondeat superior.*

██ "Churning" occurs in a securities account when a dealer, acting in his own interests and against those of his customer, induces transactions in the customer's account that are excessive in size and frequency in light of the character of the account. Note, *Churning by Securities Dealers,* 80 Harv.L.Rev. 869 (1967). A claim of churning has been held to state a cause of action under Section 10(b) and Rule 10b–5. *Landry v. Hemphill, Noyes & Co.,* 473 F.2d 365 (1st Cir.), *cert. denied,* 414 U.S. 1002, 94 S.Ct. 356, 38 L.Ed.2d 237 (1973); *Carras v. Burns,* 516 F.2d 251 (4th Cir. 1975); *Fey v. Walston & Co., Inc.,* 493 F.2d 1036 (7th Cir. 1974); *Hecht v. Harris, Upham & Co.,* 430 F.2d 1202 (9th Cir. 1970).

██ Proof of churning requires the demonstration of two elements: 1) that the broker-dealer exercised control over the account, and 2) that the broker engaged in excessive trading, considering the objectives and nature of the account. *Landry v. Hemphill, Noyes & Co., supra; Note, Churning by Securities Dealers, supra.*

In determining the existence of control, various factors may be considered, such as whether all transactions are made at the dealer's discretion; the business and investment experience of the customer; and the relationship between the dealer and the customer. Note, *Churning by Securities Dealers, supra; Landry v. Hemphill, Noyes & Co., Inc., supra; Fey v. Walston & Co., Inc., supra.*

██ Here, the transactions in plaintiff's account were made at Contrado's sole discretion. He not only made all investment decisions, but also refused to discuss with plaintiff her concerns about the trading in the account, and demonstrated anger when plaintiff sought information about it.

Plaintiff had no prior experience in or knowledge of the securities market. She did not understand the monthly statements that she received, and did not know the meaning of the basic terms associated with trading in the securities market.

In addition, the nature of the relationship between plaintiff and Contrado underscores his dominant position and her reliance on him. She met Contrado soon after she came to Boston from Ohio, and they became close friends, dating on a regular basis for a period of several months. She came to rely on him for advice on a wide variety of matters to the point of entrusting him with her blank, signed checks. She believed, on the basis of Contrado's reputation and her contacts with him, that he was a reliable broker, and someone she could trust.

Given their relationship, the fact that plaintiff received monthly statements and confirmation slips but never complained to others at Pressman about the volume of trading in her account does not undercut a finding that he exercised control over her account, or suggest that she ratified his actions.

██ Even express consent to churning does not raise the defense of waiver or estoppel if the consent is induced by undue influence over the customer, or results from the customer's trust and confidence in the broker. *Fey v. Walston & Co., Inc., supra,* 493 F.2d at 1050. Similarly, even a customer with knowledge of trading transactions may not be estopped from claiming ignorance with respect to churning, because of the added experience and knowledge necessary to ascertain a pattern of churning. *Hecht v. Harris, Upham & Co., supra,* 430 F.2d at 1209.

██ Applying those principles to this case, the mere fact that plaintiff received transaction statements does not estop her from claiming that Contrado controlled the account, in view of the other circumstances—her relative ignorance of the stock market; her trust and confidence in him; and his refusal even to discuss the trading in her account with her.

On all the evidence, this court concludes that Contrado exercised control over plaintiff's account.

 The second element of churning is the existence of a pattern of trading, excessive in light of the size and objectives of the customer's account. Plaintiff's investment objectives were conservative and oriented to preservation of capital, throughout the entire period in question.[13] The court accepts the opinion of plaintiff's expert witness that the pattern of trading in plaintiff's account was excessive in light of her objectives. He pointed in particular to the pattern of selling stocks only a few days after they were bought, and before there had been any real change in price. Such in-and-out trading is particularly characteristic of churning, as are disproportionate turnover and large brokerage commissions relative to the size of the account. *Carras v. Burns,* 516 F.2d 251, 258 (4th Cir. 1975); *Hecht v. Harris, Upham & Co.,* 430 F.2d 1202 (9th Cir. 1970); Note, *Churning by Securities Dealers,* 80 Harv.L.Rev. 869 (1967).

Commissions in plaintiff's account during 1973 almost equalled plaintiff's equity as of March 1973. The total volume of sales in her account in 1973 was 30 times her equity at the beginning of the year.[14]

For the reasons stated, the court is persuaded by the evidence that Contrado churned plaintiff's account.

Having so determined, it is necessary to consider whether Pressman is liable for his actions, either under the controlling person doctrine of § 20 of the Securities and Exchange Act of 1934, or under the doctrine of *respondeat superior.*

 Section 20, 15 U.S.C. § 78t, states in relevant part:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

In the context of this section, brokerage firms control their brokers and registered representatives. *Landry v. Hemphill, Noyes & Co., Inc.,* 473 F.2d 365 (1st Cir.), *cert. denied,* 414 U.S. 1002, 94 S.Ct. 356, 38 L.Ed.2d 237 (1973); *DelPorte v. Shearson, Hammill & Co., Inc.,* 548 F.2d 1149 (5th Cir. 1977); *Armstrong, Jones & Co. v. SEC,* 421 F.2d 359 (6th Cir.), *cert. denied,* 398 U.S. 958, 90 S.Ct. 2172, 26 L.Ed.2d 543 (1970); *Zweig v. Hearst Corp.,* 521 F.2d 1129 (9th Cir. 1975).

Defendant Pressman asserts, however, that it was acting in good faith. As evidence of its good faith, it points to its system of supervision of its broker dealers, the supervision of Contrado exercised by Schmidt and Bond, and the presence in their records of a signed trading authorization from plaintiff.

Authority is split on what actions on the part of a brokerage firm are sufficient to constitute a good faith defense to a claim of liability under § 20, although authority is uniform that the defendant has the burden of proving good faith. *Carr v. New York Stock Exchange,* 414 F.Supp. 1292 (N.D.Cal. 1976); *Gordon v. Burr,* 366 F.Supp. 156 (S.D.N.Y.1973), *modified on other grounds,* 506 F.2d 1080 (2d Cir. 1974).

 Some courts have held that liability can be found under § 20 only where there is culpable participation in the fraud by the brokerage house. Such culpability can be established by nonfeasance only if the failure to act was intended to further the fraud or prevent its discovery. *Rochez Brothers v. Rhoades,* 527 F.2d 880 (3d Cir. 1975); *Lanza v. Drexel,* 479 F.2d 1277 (2d Cir.

---

13. To the extent that there is any question about plaintiff's investment objectives, it must be resolved in her favor, because of the obligation on the registered representative to resolve any ambiguity in the customer's objectives. *See* Note, *Churning by Securities Dealers,* 80 Harv.L.Rev. 869, 875 (1967).

14. Cf. *Hecht v. Harris, Upham & Co., supra,* where the court found churning when commissions over a seven year period were equal to 40 percent of the account's value.

1973). There seems to be agreement, however, that a stricter standard is appropriate where the firm is being held accountable for the actions of its salesmen, rather than for the actions of its own officers or directors. *Lanza v. Drexel, supra; SEC v. First Securities Co. of Chicago*, 463 F.2d 981 (7th Cir.), *cert. denied, McKy v. Hockfelder*, 409 U.S. 880, 93 S.Ct. 85, 34 L.Ed.2d 134 (1972). Consequently, in cases concerning violations of 10b–5 by salesmen, in order to satisfy the good faith requirement of § 20,

> it must be shown that the controlling person maintained and enforced a reasonable and proper system of supervision and internal control over controlled persons so as to prevent, as far as possible, violations of § 10(b) and Rule 10b–5.

*Zweig v. Hearst Corp.*, 521 F.2d 1129, 1134–35 (9th Cir. 1975); *DelPorte v. Shearson, Hammill & Co., Inc.*, 548 F.2d 1149 (5th Cir. 1977); *Barthe v. Rizzo*, 384 F.Supp. 1063 (S.D.N.Y.1974); *Fey v. Walston & Co., Inc.*, 493 F.2d 1036 (7th Cir. 1974).

The reason for the higher standard for supervision of the registered representative is the greater potential for abuse of that position. The representative and the broker-dealer earn their money, directly and indirectly, by sales activity. Customers often rely on their broker-representative for investment advice. "The opportunity and temptation to take advantage of the client is ever present." *Zweig v. Hearst Corporation, supra*, 521 F.2d at 1135. This rule does not impose absolute liability on the broker-dealer, or make him an insurer for the acts of his salesmen, but it does impose a stringent duty of care. *SEC v. Lum's*, 365 F.Supp. 1046 (S.D.N.Y.1973).

The controlling inquiry is whether or not sufficient precautionary measures were taken to prevent the type of loss which in fact occurred. *Barthe v. Rizzo,*

*supra; SEC v. Lum's, supra.* Pressman argues that it had a sufficient set of supervisory procedures, as demonstrated by its compliance manuals, the visits of compliance officers to branch offices, and the periodic meetings between branch managers and salesmen. It argues further that the sales in plaintiff's account until September 1973 were reasonable, in light of her new account form that stated her investment objectives to be "short term trading profits." In addition, Pressman points out that there is a likely two month time lag before a transaction is reported to its central office. Given such a time framework, Pressman argues it acted reasonably, curbing excess trading and firing Contrado, once the reports were received at the central office. Finally, Pressman argues that the presence of the signed risk authorization in its files, dated March 14, 1973, absolves it from liability for the trading activity that is the subject of plaintiff's complaint.

This court is not persuaded by Pressman's protestations, and concludes that its supervisory role was inadequate under the circumstances of this case. Plaintiff's "new account form" was not signed by her. The information on it was neither verified by supervisory personnel nor discussed with her.

The trading in plaintiff's account should have attracted the attention of management or compliance personnel, given the number of trades, the low quality of the stocks, the pattern of in-and-out trading and the failure to buy dividend producing stocks.[15]

Furthermore, in April of 1973, the branch manager was alerted by a memo from supervisor Bond suggesting that he scrutinize Contrado's accounts for excessive trading, but there is no evidence of any follow-up, either by the branch manager or Bond. Had there been some review and follow-up

---

15. The suspect pattern of trading in plaintiff's account from the very beginning deprives the defendant of any benefit it sought to obtain from the 30 to 60 day lag between a trade and the receipt of a report of it in its central office. Even with such a lag time, Pressman's supervisory personnel should have been alerted earlier to the type of trading in plaintiff's account, even though it may have taken longer to assemble a clear picture as to volume.

even at that date, much of plaintiff's loss might have been averted.[16]

Moreover, there is no evidence that the supervisory or compliance staff took any further notice of plaintiff's account until the fall. When Pressman did take action against Contrado, it was to discipline him for passing a bad check, not to punish his trading activity. His firing, therefore, is not persuasive evidence of active supervisory procedures.

■ Finally, the execution of the trading authorization did not relieve the brokerage company from its duty to supervise plaintiff's account and exercise due diligence. *Rolf v. Blyth Eastman Dillon & Co., Inc.*, 424 F.Supp. 1021 (S.D.N.Y.1977).

The court concludes, therefore, that the defense of good faith is not available to Pressman, because of its failure to supervise Contrado's activities adequately. Pressman is liable as a controlling person under § 20(a) for the churning by Contrado of plaintiff's account.[17]

■ Even if Pressman had a valid good faith defense to liability under § 20(a), it would, nonetheless, be liable under the common law doctrine of *respondeat superior.* Although there is a division of authority on this question, there appears to be a strong trend toward holding broker-dealers liable for the actions of their broker-representatives concurrently under § 20 and under common law doctrines. *See SEC v. Geon Industries, Inc.*, 531 F.2d 39 (2d Cir. 1976); *Holloway v. Howerdd*, 536 F.2d 690 (6th Cir. 1976); *SEC v. Management Dynamics, Inc.*, 515 F.2d 801 (2d Cir. 1975); *Fey v. Walston & Co., Inc.*, 493 F.2d 1036 (7th Cir. 1974); *Lewis v. Walston & Co.*, 487 F.2d 617 (5th Cir. 1973); *Johns Hopkins University v. Hutton*, 422 F.2d 1124 (4th Cir. 1970), *cert. denied*, 416 U.S. 916, 94 S.Ct. 1622, 40 L.Ed.2d 118 (1974); *Armstrong, Jones & Co. v. SEC*, 421 F.2d 359 (6th Cir.), *cert. denied,*

398 U.S. 958, 90 S.Ct. 2172, 26 L.Ed.2d 543 (1970). *Contra, Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th Cir. 1975); *Rochez Brothers v. Rhoades*, 527 F.2d 880 (3d Cir. 1975); *Lanza v. Drexel*, 479 F.2d 1277 (2d Cir. 1973). Of the Court of Appeals opinions holding that § 20 is the exclusive remedy against brokerage firms, only one concerned liability for the actions of registered representatives. The other two decisions concerned fraudulent acts by officers of the corporation itself, over whom control would have been more difficult. Both acknowledge that "directors cannot be expected to exercise the kind of supervision over a corporation president that brokers must exercise over salesmen." *Lanza v. Drexel, supra*, at 1301; *Rochez Brothers v. Rhoades, supra.*

Given the desirability and importance to the economy of protecting the investing public from predatory practices, it makes sense to consider § 20 and the common law doctrine of *respondeat superior* as complementary rather than exclusive remedies. *Fey v. Walston & Co., Inc., supra*, 493 F.2d at 1052.

Pressman, therefore, is liable for the actions of Contrado under the doctrine of *respondeat superior*, independent of its liability under § 20.

## IV.

■ Had plaintiff and defendant operated her account as a partnership, this court's ultimate findings and conclusions would be the same.

Contrado would have been acting as the fiduciary of the partnership in serving as broker for the account. His role as a fiduciary would have derived not only from his position as broker for the account, but also from the duty, as between partners, of utmost loyalty and good faith. *Cardullo v. Landau*, 329 Mass. 5, 105 N.E.2d 843 (1952);

---

16. The facts here, therefore, are distinguishable from those in *SEC v. Lum's, supra,* where the brokerage house was not held liable when the court could not construct any system of supervision that would have prevented the injury that occurred.

17. Accordingly, the court need not determine the merit of plaintiff's alternative theories of action.

*Wilkes v. Springside Nursing Home,* —— Mass. ——, 1976 Mass.Adv.Sh. 2135, 353 N.E.2d 657; *Shinberg v. Garfinkle,* 361 Mass. 110, 278 N.E.2d 738 (1972).[18]

Even assuming a partnership existed, the relevant elements for determining if churning took place remain the same: whether Contrado exercised control over the account, and whether the trades were excessive in light of the account's needs and objectives. *See* Section III, *supra.*

Evidence that plaintiff had acquiesced in or encouraged the pattern of trading in which Contrado engaged on behalf of the account would not necessarily undermine a finding that he exercised control over the account. *Landry v. Hemphill, Noyes & Co.,* 473 F.2d 365 (1st Cir.), *cert. denied,* 414 U.S. 1002, 94 S.Ct. 356, 38 L.Ed.2d 237 (1973); *Nash v. J. Arthur Warner & Co.,* 137 F.Supp. 615 (D.Mass.1955); *Carr v. Warner,* 137 F.Supp. 611 (D.Mass.1955). The significant issue is whether plaintiff knew what she was doing when she went along with Contrado's tactics. From all the evidence, this court is persuaded that plaintiff did not have any independent basis for evaluating Contrado's decisions: because of her trust in him, plaintiff accepted Contrado's course of action as a matter of faith.

The situation here is analogous to that considered in *Hecht v. Harris, Upham & Co.,* 430 F.2d 1202 (9th Cir. 1970), where the Ninth Circuit considered claims advanced by a relatively experienced investor that her broker-representative had fraudulently converted her investment account from blue chip investments to one dominated by low-grade speculative securities, and had "churned" her account. The court found that the investor was estopped from asserting wrongful conversion of her securities, because she had received confirmation slips on each transaction, had discussed their contents on a regular basis with her registered representative, and had consulted frequently with her own attorneys and tax accountants about the trading in her account. The court held, however, that these facts did not estop her from claiming that she lacked the experience and knowledge to realize that the trading in her account was excessive and amounted to churning. 430 F.2d at 1209. Similarly, a finding here that plaintiff had acquiesced in the formation of the partnership and had acquiesced in Contrado's investment decisions does not preclude the conclusion that she did so because of her ignorance of the stock market and her total reliance on his judgment.

In evaluating whether the pattern of trading would have been excessive if the account had been operated as a partnership on behalf of Contrado and the plaintiff, it is necessary to determine the investment objectives of the partnership. The plaintiff has maintained that she was interested in preservation of capital. Contrado's interest was speculation. Given this apparent conflict in the investment objectives of the customer—the partnership—it was the duty of the registered representative, Contrado, to point out the need for clarification. Note, *Churning by Securities Dealers, supra,* 80 Harv.L.Rev. 869, 875; NASD Rules of Fair Practice, Art. III, § 2, in NASD Manual at D–5 (1976). In view of Contrado's obvious failure to clarify the investment objectives of the "partnership" this court finds that the investment objectives were those stated by the plaintiff, and that

---

18. See also *Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545 (1928), in which Judge Cardozo said of the loyalty due among partners:

Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the "disintegrating erosion" of particular exceptions. *Wendt v. Fischer,* 243 N.Y. 439, 444, [154 N.E. 303]. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court.

the trading in the account was excessive in light of those objectives. *See* section III, *supra.*

### V.

The remaining issue is the proper measure of damages due plaintiff. Compensation of a defrauded plaintiff in a churning case must always be somewhat speculative as it is impossible to determine what the result would have been had the account been properly managed. Note, *Churning by Securities Dealers*, 80 Harv.L.Rev. 869, 883–5 (1967). The defendant's argument that award of any damages beyond out-of-pocket losses would be punitive and hence in violation of the securities laws [19] is disingenuous in light of the difficulty of ascertaining actual damages. While it would be difficult to fashion a general rule to apply to all situations, the court finds guidance in the general principle followed by the Seventh Circuit that "damages should compensate the customer by fair approximation for the losses sustained as a proximate result of unlawful churning." *Fey v. Walston & Co., Inc., supra,* 493 F.2d at 1055, n. 26.

█ A quasi-contractual measure of damages seems most appropriate in the case at bar, because it will require the defendants to return all the benefits which they received, as they failed to give the plaintiff diligent supervision of her account. *Rolf v. Blyth, Eastman, Dillon & Co., Inc.,* 424 F.Supp. 1021, 1045 (S.D.N.Y.1977).

It is uncontested that plaintiff's account was charged $21,308 in 1973 for commissions on trading; that figure is the proper measure of damages.

By so holding, the court does not suggest that this is the appropriate measure of damages in all situations. In most cases where out-of-pocket damages have been rewarded, and a reward based on the registered representative's commissions has been rejected, the latter has been much less than the former, and the court feared that the quasi-contractual remedy would be inadequate compensation for the victim's injury. *DelPorte v. Shearson, Hammill & Co., Inc.,* 548 F.2d 1149 (5th Cir. 1977); *Fey v. Walston & Co., Inc.,* 493 F.2d 1036 (7th Cir. 1974); *cf. Hecht v. Harris, Upham & Co., supra* (damages limited to commissions for churning violation where plaintiff estopped from denying knowledge of existence of transactions).

### VI.

Accordingly, the court orders judgment for the plaintiff Judy Kravitz in the amount of $21,308.00 plus interest. An order has issued.

**19.** The Securities Exchange Act of 1934, section 28, 15 U.S.C. § 78bb provides:

. . . but no person permitted to maintain a suit for damages under the provisions of this chapter shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the act complained of.